# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

STRAFFORD COUNTY,
NEW HAMPSHIRE

       Plaintiff,

  v.

EVERNORTH HEALTH, INC. (FORMERLY
EXPRESS SCRIPTS HOLDING
COMPANY); EXPRESS SCRIPTS, INC.;
EXPRESS SCRIPTS ADMINISTRATORS,
LLC; ESI MAIL PHARMACY SERVICE,
INC.; EXPRESS SCRIPTS PHARMACY,
INC.; EXPRESS SCRIPTS SPECIALTY
DISTRIBUTION SERVICES, INC.; MEDCO
HEALTH SOLUTIONS, INC.; MERCK-
MEDCO MANAGED CARE, LLC;
UNITEDHEALTH GROUP, INC.;
OPTUMRX INC.; OPTUMINSIGHT LIFE
SCIENCES, INC.; THE LEWIN GROUP,
INC.; INGENIX, INC.; INGENIX
PHARMACEUTICAL SERVICES, INC.
AND OPTUMINSIGHT, INC.

       Defendants.

**MDL 2804**

**Case No. 1:17-md-2804-DAP**

**Member Case No. _____**

**Judge Dan Aaron Polster**

**Jury Trial Demanded**

**[REDACTED]**

# COMPLAINT

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1

II.   VENUE AND JURISDICTION ..................................................................... 9

III.  PARTIES ...................................................................................................... 10

    A.   Plaintiff .............................................................................................. 10

    B.   Defendants ......................................................................................... 10

    C.   The PBMs' Corporate Families Function as a Single Enterprise ....... 20

        1.   Express Scripts/Evernorth Corporate Family ........................... 20

        2.   The UHG/Optum Corporate Family ......................................... 22

IV.   FACTUAL ALLEGATIONS ......................................................................... 26

    A.   Background on the Opioid Manufacturers' Role in the Opioid Epidemic .......... 26

    B.   The PBMs Played a Central Role in Causing the Opioid Crisis .......................... 28

        1.   The PBMs Profit From Each Brand and Generic Opioid Dispensed ........ 30

        2.   Because the PBMs Profit from Increasing Opioid Utilization, the PBMs Established Formularies Which Have Allowed Largely Unrestricted Access to Opioids ................................................. 34

            a.   PBMs' Role in Designing and Managing Formularies ................ 34

            b.   PBMs Represent That They Design Formularies that Promote Safe Drug Use ............................................................. 36

            c.   PBMs' Established Formularies Which Have Allowed Largely Unrestricted Access to Opioids ..................................... 37

        3.   The PBMs and Opioid Manufacturers Use Parity Terms in Their Rebate Agreements to Ensure There Is a Common Purpose of Unfettered Access to the Opioid Drugs .................................... 39

        4.   The PBMs Knew Opioid Epidemic Was Devastating Communities And That They Were Uniquely Situated to Prevent the Public Health Crisis ................................................................................. 43

i

5.      Even Though the PBMs Knew the Opioid Epidemic Was Devastating Communities, the PBMs Failed to Undertake Actions That Would Have Drastically Reduced Inappropriate Prescribing and Dispensing of Opioids......................................................................................................... 49

6.      The PBMs Failed to Block Access to Opioids Through Their CDUR Programs ...................................................................................................... 55

7.      Express Scripts and UHG/Optum Assisted the Opioid Manufacturers in Marketing Their Products ....................................................................... 61

     a.      PBMs' "Pull Through" Efforts with the Opioid Manufacturers ... 61

     b.      PBMs Conspired with the Opioid Manufacturers through Research and Consulting Agreements ........................................... 62

C.      The PBMs' Mail Order Pharmacy Activity Further Exacerbated the Opioid Crisis ............................................................................................................ 69

D.      Defendants Have Admitted They Could Have Prevented the Opioid Epidemic .. 79

E.      Express Scripts and UHG/Optum Caused the Public Health Crisis in Strafford County........................................................................................................... 80

V.      **TOLLING OF THE STATUTE OF LIMITATIONS** .................................................. **81**

VI.      **CAUSES OF ACTION** ....................................................................................... **83**

1.      PUBLIC NUISANCE .................................................................................. 83

2.      CONSPIRACY ............................................................................................ 90

3.      AIDING AND ABETTING........................................................................... 91

4.      ENHANCED COMPENSATORY DAMAGES ............................................... 91

VII.      **PRAYER FOR RELIEF**........................................................................................ **92**

VIII.      **JURY DEMAND** ................................................................................................ **92**

Plaintiff, Strafford County, New Hampshire ("Strafford County" or "Plaintiff"), by and through the undersigned attorneys, against above Defendants Evernorth Health, Inc. (formerly Express Scripts Holding Company); Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts Specialty Distribution services, Inc.; Medco Health Solutions, Inc.; Merck-Medco Managed Care, LLC (collectively, "Express Scripts"); UnitedHealth Group, Inc.; OptumRx Inc.; OptumInsight Life Sciences, Inc.; The Lewin Group, Inc.; Ingenix, Inc.; Ingenix Pharmaceutical Services, Inc.; and OptumInsight, Inc. (collectively "UHG/Optum") (together "Express Scripts" and "UHG/Optum" are referred to as "Defendants"), alleges as follows:

## I.        INTRODUCTION

1.        This case arises from the worst man-made epidemic in modern medical history—the over-prescription, misuse, diversion, and abuse of opioids—and the central role two pharmacy benefit managers, Express Scripts and UHG/OptumRx (the "PBMs"), have played in that epidemic.

2.        The PBMs are vertically-integrated colossuses that dominate the opioid reimbursement and delivery chain—currently sitting at 5th (OptumRx) and 12th (Express Scripts) on the Fortune 500 list ranking largest corporations by revenue.

3.        These two corporate monoliths are among: (1) the largest pharmacy benefit managers in the United States (collectively covering over 166 million lives); (2) the largest pharmacies in the country (making up 2 of the top 5 dispensing pharmacies in the U.S.); and (3) the largest healthcare data, consulting, and analytics companies in the United States.

4.        Express Scripts' and UHG/Optum's role in creating and sustaining the opioid epidemic until recently has been largely hidden from public scrutiny. However, it has now become clear that from the late 1990s these corporate monoliths facilitated the reckless promotion of

1

opioids by manufacturers, the oversupply of opioid shipments by distributors, and the irresponsible dispensing of prescription opioids by numerous pharmacies.

5.     Through their dominant market positions, the PBMs act as the gatekeepers of the opioid market throughout the country, as well as in New Hampshire and Strafford County. For over 166 million patients, these PBMs control which opioids are available, in what amount, at what price, and with what restrictions.

6.     The PBMs exert this control over the opioid market through their roles: (1) managing the pharmacy benefits of their clients; (2) operating the some of the largest pharmacies in the country; and (3) providing consulting, data, and research services directly to opioid manufacturers.

7.     First, as pharmacy benefit managers the PBMs are hired by different entities (such as private and public health plans, insurers and employers who create health-plans for their employees) to provide prescription benefit management services for patients. The PBMs generally refer to these entities as being their "clients." Throughout the relevant years, both PBMs have controlled the prescription benefits for clients in Strafford County.

8.     The vast majority of the PBMs' clients have delegated to the PBMs day-to-day authority and control over various tasks that impact which drugs are covered, including: (a) the structure and composition of formularies, which dictate the extent to which drugs are covered by their clients; (b) the negotiation of rebates and other fees with drug makers, including with Purdue and the other opioid makers (collectively referred to herein as "Opioid Manufacturers"[1]); and (c)

---

[1] "Opioid Manufacturers" refers to any drug manufacturer that makes opioids, including but not limited to Purdue Pharma, Endo Pharmaceuticals, Janssen/J&J Pharmaceuticals, Actavis, Insys, Teva Pharmaceuticals, Cephalon.

the processing, payment, and monitoring of drugs dispensed at pharmacies within the PBMs' contracted networks.

9.      The PBMs have historically represented that they work on their clients' behalf to manage their drug benefits. Their clients in turn have relied on them to design and monitor formularies, prescription plans, and pharmacy networks that ensure safe dispensing of prescription drugs. Toward that end, the PBMs have represented to their clients and the public that they would make formulary decisions and use the controls that they routinely employ (known as "Utilization Management" or "UM") to restrict inappropriate opioid dispensing and to promote safe and effective pain treatment.

10.     The PBMs also represent that they police the 70,000 pharmacies within their networks to identify and address instances of opioid over-prescribing and diversion.

11.     As alleged more fully herein with regard to opioid drugs, those representations were often not true. In reality, for more than two decades the PBMs have been working with the Opioid Manufacturers towards a common illegitimate purpose aimed at increasing unfettered access to opioids across the country, including in New Hampshire and Strafford County.

12.     While the PBMs have represented they work on their clients' behalf and make formulary decisions and implement Utilization Management measures in their interests, behind closed doors they had entered into confidential rebate and other agreements with the Opioid Manufacturers which blocked the PBMs from limiting opioid prescribing to only appropriate uses.

13.     Moreover, for more than two decades the PBM Defendants have had direct access to data for billions of pharmacy claims showing them exactly who has been prescribing, who has been dispensing, and who has been receiving prescription opioids. This data should have given them insight into and control over the flow of opioids into communities across the country. Instead of using this data to restrict the over-dispensing of opioids, in exchange for lucrative agreements,

the PBMs provided this detailed prescribing data to the Opioid Manufacturers which facilitated formulary decisions favoring unfettered access to the opioid drugs and limiting implementation of Utilization Management measures which would have aided communities like Strafford County in controlling the widespread abuse and diversion of opioids.

14.     Tellingly, each of the Opioid Manufacturers and the PBMs entered into agreements to preserve parity treatment that would not disadvantage the drugs of the competitor Opioid Manufacturers within the PBMs' formularies. All of these actions were contrary to the interests of the PBMs' clients and furthered the common purpose between the Opioid Manufacturers and the PBMs.

15.     As they have grown and consolidated, the Defendant PBMs have increased their control over formulary decisions for the vast majority of patients in the United States. The Defendant PBMs now control formulary decisions for some 166 million Americans (often referred to as "lives" by the PBMs and by the Opioid Manufacturers with whom they contracted). Over at least the last two decades, the Opioid Manufacturers have made millions of dollars in rebate payments to the Defendant PBMs in exchange for unfettered access for their opioid products on the PBMs' formularies.

16.     In their roles as mail order pharmacies, Defendant PBMs have each operated within the federally controlled closed drug distribution system, and yet despite their obligations to dispense opioids in a safe and effective manner as part of this system, they dispensed tens of billions of MMEs of opioids into communities across the country, including in Strafford County

17.     To make matters worse, as research and consulting entities, Express Scripts and UHG/Optum participated directly in the efforts of the Opioid Manufacturers to deliberately pollute the national marketplace with lies and misinformation about the addictive nature of opioids, as well the "appropriate" use of opioids, and expand their use beyond traditional cancer treatment and

palliative care contexts—i.e., the precise activities that formed the foundation of liability that has resulted in billions of dollars in settlements by the Opioid Manufacturers.

18.     The collusive relationships between the Opioid Manufacturers and the PBMs facilitated the formation of agreements between the PBMs and the Opioid Manufacturers, which corrupted the policing mechanisms that the PBMs would have otherwise employed, directly causing the opioid epidemic, and resulting in the cataclysmic economic and social damage to virtually every community in America. The motivation for the PBMs to turn a blind eye to the epidemic was the huge profits they pocketed in the form of rebate payments and other payments they received. The ensuing plague has been both indiscriminate and ruthless. Its impact has reached across demographic lines, harming every economic class, race, gender and age group.

19.     The opioid epidemic the has resulted in economic, social and emotional damage to virtually every community in the United States and millions of Americans. It is indiscriminate and ruthless. It has impacted across demographic lines, harming every economic class, race, gender, and age group. Prescription and illegal opioids account for more than sixty percent (60%) of overdose deaths in the United States, a toll that has quadrupled over the past two decades, according to the United States Centers for Disease Control and Prevention ("CDC"). More people died from opioid-related causes than car accidents or guns. More than one hundred seventy-five (175) people die every day from opioid overdoses, as if an airplane crashes, killing everyone on board, every day.

20.     The costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement due to opioid use disorder and fatal opioid overdose $1.02 trillion a year.

21.     The devastating impact of opioid abuse cannot be overstated. After years of decreasing death rates in the United States, they are now on the rise fueled in part by an increase in opioid-related drug overdose deaths. Drug overdoses are now the leading cause of death for

Americans under the age of fifty (50). The number of Americans who died of drug overdose deaths in 2017 was roughly equal the number of Americans who died in the Vietnam, Iraq, and Afghanistan wars combined.

22.     From 1999 through the present, over 1,000,000 people died from an overdose involving opioids. Well over half of those deaths involved opioids prescribed by doctors to treat pain. These opioids include, but are not limited to, brand-name prescription medications like OxyContin, Opana, Nucynta, Duragesic, Subsys, Actiq, and Fentora which were manufactured respectively by the Opioid Manufacturers. Generic opioids such as hydrocodone, oxycodone, fentanyl, hydromorphone, morphine, methadone, tapentadol, and oxymorphone were also responsible for creating this epidemic.

23.     The opioid epidemic rages on to this day and continues to get worse every year. A staggering 110,000 people died of opioid overdoses in 2022.

24.     Many of the overdoses from non-prescription opioids are also directly related to prescription pills. Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to heroin. According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin. In fact, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin, and the CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. Individuals who used prescription opioids more recently have turned to or been exposed to fentanyl, with even more lethal effects.

25.     In the words of Robert Anderson, who oversees death statistics at the Centers for Disease Control and Prevention, "I don't think we've ever seen anything like this. Certainly not in modern times." On October 27, 2017, then-President Trump declared the opioid epidemic a public

health emergency. On December 22, 2022, Health and Human Services Secretary Xavier Becerra renewed the determination that "a opioid public health emergency exists nationwide."

26.     New Hampshire and Strafford County have been hit hard by the opioid epidemic. New Hampshire ranks in the top five states for highest rates of opioid-involved deaths and leads the nation in overdose deaths per capita from fentanyl.

27.     From 2015-2019, Strafford County had the highest opioid related emergency room visits per capita in New Hampshire.

28.     Moreover, the opioid epidemic continues to get worse in New Hampshire—the State saw a 20% increase in opioid overdose deaths from 2019 to 2021 as compared to the previous two years.

29.     Plaintiff is now having to allocate substantial taxpayer dollars, resources, staff, energy, and time to address the damage the opioid scourge has left in its wake and to address its many casualties. Fire and emergency medical services are over-utilized because of an increased number of opioid-related overdoses. The burden on law enforcement is substantially increased by opioid-related crimes related to prescription opioid theft, diversion, and sales on the black market. County and Town jails, hospitals, clinics, treatment centers, intervention programs, social workers, foster care, courts, schools—virtually every aspect of County and Town service and budget has been significantly and negatively impacted by this Defendant-made epidemic.

30.     The damage inflicted cuts across ages and generations. Many who have succumbed to overdoses have overdosed more than once. Those who survive are often not alone at the time. Family members, including young children, have watched their loved ones lose consciousness or die. Young children, including toddlers, also have been the direct victims of overdoses themselves after coming into contact with opioids.

31.     Children are being displaced from their homes and raised by relatives or placed in the County's or Towns' care due to parents' addiction. Others lose the chance to go home. Unable to be discharged from the hospital with their mothers, babies born addicted to opioids due to prenatal exposure are being placed in the care of the Town or local citizens or non-profits who do their best to comfort them through the pain of withdrawal.

32.     The PBMs' conduct was a direct cause of the opioid epidemic. And their misconduct has had a severe and far-reaching public health consequence, the costs of which are borne by Plaintiff and other governmental entities.

33.     The PBMs have aided and abetted in the creation of a public nuisance and a blight. Governmental entities, and the services they provide their citizens, have been strained by this public health crisis.

34.     The other actors—including the Opioid Manufacturers, distributors, and pharmacies—with whom the PBMs worked directly with in creating this public health crisis have faced civil and at times criminal liability for their roles; they have been made to contribute billions of dollars to assist with the generation devastation caused by their efforts. A few examples include:

(a)     In October 2020, the Department of Justice announced that Purdue entered into a federal settlement of more than $8 billion to resolve pending criminal and civil investigations into Purdue's role in causing the opioid epidemic;

(b)     In February 2022, the largest U.S. drug distributors and Opioid Manufacturer Janssen/J&J agreed to finalize a proposed $26 billion settlement resolving claims by states and local governments that they helped fuel the U.S. opioid epidemic;

(c)     In July 2022, Teva announced it would pay up to $4.25 billion as part of a nationwide settlement to end litigation over its alleged role in the U.S. opioid crisis;

(d)     In August 2022, following a jury trial, a federal judge ruled that the major retail pharmacies Pharmacy operators CVS, Walmart and Walgreens must pay a combined $650.6 million to two New Hampshire counties to address the damage done by the opioid epidemic;

(e)     In August 2022, Opioid Manufacturer Endo agreed to pay $450 million to states to resolve opioid lawsuits across the country.

35.     Working alongside these other actors, Express Scripts and UHG/Optum helped cause the ongoing opioid crisis and are necessary parties to addressing the damage it has wreaked, including the costs of abatement.

36.     Plaintiff brings this suit to help address the devastating march of this epidemic and to hold the PBMs responsible for the crisis they helped cause.

## II.     VENUE AND JURISDICTION

37.     This Court also has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiff is of a different citizenship than Defendants.

38.     This Court has personal jurisdiction over the Defendants because Defendants conduct business in New Hampshire, purposefully direct or directed their actions toward New Hampshire, consented to be sued in New Hampshire by registering an agent for service of process, consensually submitted to the jurisdiction of New Hampshire when obtaining a distributor or pharmacy license, caused tortious injuries in New Hampshire, and have the requisite minimum contacts with New Hampshire necessary to permit the Court to exercise jurisdiction over Defendants. This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Hampshire.

39.     Venue is proper within this District pursuant to 28 U.S.C. § 1391 as this District is a judicial district where Defendants are subject to personal jurisdiction, a substantial part of the events or omissions giving rise to the claim occurred in this District, Defendants transact their affairs in this District.

40.     This Court has original jurisdiction over this action for purposes of pretrial proceedings pursuant to 28 U.S.C. § 1407, and Case Management Order One, ¶ 6.a entered on April 11, 2018 as ECF Doc. No. 232 in *In Re: National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D. Ohio).

### III.     PARTIES

**A.     Plaintiff**

41.     This action is brought for and on behalf of **Strafford County, New Hampshire**. Strafford County brings this suit to recover all associated damages caused by Defendants' actions, as alleged in this Complaint and to be further developed through discovery.

42.     At all relevant times, Plaintiff provided a wide range of services on behalf of, and for its residents. This includes but is not limited to, services for families and children, public health, public assistance, law enforcement, and emergency care.

**B.     Defendants**

43.     **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.

44.     Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center 1209 Orange St Wilmington, Delaware 19801.

45.     Evernorth, through its executives and employees, control the company policies that inform its PBM and mail order services, including with respect to the at-issue drugs, as well as Express Scripts' data, analytics, and research services.

46.     Evernorth's conduct has had a direct effect in New Hampshire, including Strafford County.

47. Evernorth is the immediate or indirect parent of pharmacy, PBM, and research subsidiaries that operate throughout New Hampshire, including Strafford County, which engaged in the activities that gave rise to this Complaint.

48. In each annual report for at least the last decade, Evernorth has repeatedly, continuously, and explicitly stated "[Evernorth] works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to . . . improve members' health outcomes."

49. **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

50. Express Scripts, Inc. is registered to do business in New Hampshire and may be served through its registered agent: CT Corporation System, 2 1/2 Beacon Street, Concord, New Hampshire, 03301.

51. Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New Hampshire that engaged in the conduct, which gave rise to this Complaint.

52. During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail order services, including with respect to the at-issue drugs, as well as Express Scripts' data and research services.

53. **Defendant Express Scripts Administrators, LLC,** is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

54. Express Scripts Administrators, LLC is registered to do business in New Hampshire and may be served through its registered agent: CT Corporation System, 2 1/2 Beacon Street, Concord, New Hampshire, 03301.

55. Express Scripts Administrators, LLC holds one license with the Board of Insurance in New Hampshire.

56. During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in New Hampshire, including Strafford County, discussed in this Complaint.

57. **Defendant Medco Health Solutions, Inc.** is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey and is a wholly owned subsidiary of Evernorth.

58. Medco is registered to do business in New Hampshire and may be served through its registered agent: CT Corporation System, 2 1/2 Beacon Street, Concord, New Hampshire, 03301.

59. **Defendant Merck-Medco** was acquired in the early 1990s by Merck & Co as its pharmacy benefit manager subsidiary.

60. In 2002, Merck & Co spun off Merck-Medco into a publicly traded company, Medco Health Solutions.

61. Merck-Medco and Medco Health Solutions, Inc. are referred to herein as "Medco."

62. In 2012, Express Scripts acquired Medco for $29 billion.

63. Prior to the merger Express Scripts and Medco were two of the largest PBMs in the United States and in New Hampshire.

64. Prior to the merger, Medco provided the PBM and mail order services, including with respect to the at-issue drugs, as well as the company's data and analytics services in New Hampshire, which gave rise to Plaintiff' causes of action in this Complaint.

65.     Following the merger, all of Medco's PBM, mail order pharmacy, and data and research functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's customers becoming Express Scripts' customers.

66.     **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

67.     ESI Mail Pharmacy Service, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, Delaware 19801.

68.     ESI Mail Pharmacy Service, Inc. holds six licenses with the Board of Pharmacy in New Hampshire.

69.     During the relevant time period, ESI Mail Pharmacy Service provided the mail order pharmacy services in New Hampshire, including Strafford County, discussed in this Complaint, which gave rise to the causes of action in this Complaint.

70.     **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

71.     Express Scripts Pharmacy, Inc. is registered to do business in New Hampshire and may be served through its registered agent: CT Corporation System, 2 1/2 Beacon Street, Concord, New Hampshire, 03301.

72.     Express Scripts Pharmacy, Inc. holds six licenses with the Board of Pharmacy in New Hampshire.

73.     Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. are referred to herein as "Express Scripts Mail Order Pharmacy."

74.     In 2021, Express Scripts Mail Order Pharmacy was the third largest dispensing pharmacy in the United States and made $54.4 billion in prescription revenues.

75.     From 2006-2014, Express Scripts Pharmacy bought over 22.9 billion MMEs of opioids spread over 1.1 billion opioid dosage units.

76.     **Defendant Express Scripts Specialty Distribution Services, Inc**. is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Specialty Distribution Services, Inc.'s principal place of business is at the same location as Evernorth.

77.     Express Scripts Specialty Distribution Services, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

78.     Express Scripts Specialty Distribution Services, Inc. holds two licenses with the Board of Pharmacy in New Hampshire.

79.     During the relevant time period, as described in more detail below, Express Scripts Specialty Distribution Services, Inc. worked directly with the Opioid Manufacturers to expand the opioid market, ████████████████████████████████████████████ ████████████████████████████████████

80.     Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Express Scripts Mail Order Pharmacy, Express Scripts Specialty Distribution Services, Inc., and Medco, including all predecessor and successor entities, are referred to as "Express Scripts."

81.     Express Scripts is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, and research provider; and (3) mail order pharmacy. During the relevant time period,

Express Scripts contracted with the Opioid Manufacturers in each of these capacities. At all relevant times, Express Scripts performed these services in New Hampshire and in Strafford County.

82.     Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. Express Scripts' market power has only increased since the Cigna merger.

83.     Express Scripts' annual revenue as of 2022 is over $100 billion.

84.     As of December 31, 2018, more than 68,000 retail pharmacies, representing over 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.

85.     According to Express Scripts' annual reports and public statements, Express Scripts standard formularies are "governed by [its] National Pharmacy & Therapeutics Committee (the 'P&T Committee'), a panel of independent physicians and pharmacists in active clinical practice, representing a variety of specialties and practice settings and typically with major academic affiliations." Express Scripts touts that the "the P&T Committee considers the drug's *safety and efficacy*," and the company "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of *safety and efficacy*." Express Scripts "re-evaluate[s] [its] National Preferred Formulary on an annual basis. [It] looks at the formulary first from a clinical perspective to ensure that it provides access to *safe and effective* medications in all therapy classes."

86.     At all times relevant hereto, Express Scripts maintained formularies that are used nationwide, including in New Hampshire and Strafford County. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in New Hampshire, including in Strafford County.

87.    **Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group" or "UHG") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

88.    UnitedHealth Group may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

89.    UnitedHealth Group, Inc. is a Fortune 5 diversified managed healthcare company. In 2022, UnitedHealth Group listed revenue in excess of $324 billion. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans and pharmacy benefits through its wholly-owned subsidiaries.

90.    UnitedHealth Group operates through two connected divisions—Optum and UnitedHealthcare ("UHC"). As discussed in greater detail below, Optum provides PBM services; mail order pharmacy services; and data, analytics, consulting, and research services. UHC provides health insurance and health benefit services.

91.    UnitedHealth Group, through its executives and employees, control the enterprise-wide policies that inform both UHC and Optum's lines of business in order to maximize profits across the corporate family.

92.    UnitedHealth Group's conduct had a direct effect in New Hampshire, including Strafford County.

93.    **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

94.    OptumInsight, Inc. is registered to do business in New Hampshire and may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

95.     OptumInsight, Inc. holds one license with the Board of Insurance in New Hampshire.

96.     **Defendant OptumInsight Life Sciences, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

97.     In 2011, UHG renamed QualityMetric as OptumInsight Life Sciences, Inc.

98.     OptumInsight Life Sciences, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

99.     **Defendant The Lewin Group, Inc.** is a North Carolina corporation with its principal place of business located in Eden Prairie, Minnesota.

100.    The Lewin Group, Inc. is registered to do business in New Hampshire and may be served through its registered agent: CT Corporation System, 2 1/2 Beacon Street, Concord, New Hampshire, 03301.

101.    **Defendant Ingenix Pharmaceutical Services, Inc. and Defendant Ingenix, Inc. ("Ingenix")** were wholly owned subsidiaries of UnitedHealth Group.

102.    In 2011, UHG renamed Ingenix as OptumInsight. The name change came after the State of New York investigated Ingenix related to a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with the State and giving rise to U.S. Congressional hearings.

103.    OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; Ingenix, and The Lewin Group, Inc., as well as their predecessors, successors, affiliates, including but not limited to Innovus, Innovus Research, i3, QualityMetric, Htanalytics, ChinaGate, and CanReg, are referred to herein as "OptumInsight."

17

104.     OptumInsight provides data, analytics, research, consulting, technology and managed services.

105.     OptumInsight is an integral part of the conduct that gave rise to Plaintiff' causes of action. As discussed in detail below, throughout the relevant time period, OptumInsight worked directly with the Opioid Manufacturers, ███████████████████████████████ ███████████████████████████████████████████████ ███████████████████████

106.     Each Opioid Manufacturer had dedicated executives assigned to OptumInsight. The Opioid Manufacturers utilized their relationships with OptumInsight to deepen their ties to the overall UHG/Optum corporate family.

107.     OptumInsight was paid tens of millions of dollars by the Opioid Manufacturers during the relevant time period for its work to expand the opioid market.

108.     During the relevant time period, OptumInsight's data collection and analysis included prescription claims data related to New Hampshire patient's and health plan's opioid utilization, for use in its research and consulting efforts in coordination with the Opioid Manufacturers to expand the opioid market and increase opioid utilization. OptumInsight's misconduct had a direct and detrimental effect on New Hampshire and Strafford County.

109.     **Defendant OptumRx, Inc. ("OptumRx")** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614.

110.     OptumRx is registered to do business in New Hampshire and may be served through its registered agent: CT Corporation System, 2 1/2 Beacon Street, Concord, New Hampshire, 03301.

111.     OptumRx holds 1 license with the Board of Pharmacy and 1 license with the Board of Insurance in New Hampshire.

112.    Prior to 2011, OptumRx was known as Prescription Solutions. In addition, OptumRx grew as a result of numerous mergers and acquisitions. For example, in 2012, a large PBM, SXC Health Solutions bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company Catamaran Corp. Following this UHG bought Catamaran Corp in a deal worth $12.8 billion and merged Catamaran with OptumRx.

113.    Prior to merging with OptumRx (or being renamed), Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. engaged in the at-issue PBM and mail order activities.

114.    OptumRx and all of its predecessors including but not limited to Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. are referred to herein as "OptumRx."

115.    Collectively, UHG, OptumRx, and OptumInsight are referred to as "UHG/Optum."

116.    UHG/Optum is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, consulting, and research provider; and (3) mail order pharmacy. During the relevant time period, UHG/Optum contracted directly with the Opioid Manufacturers in each of these capacities. At all relevant times, UHG/Optum performed these services and derived substantial revenue in New Hampshire, including Strafford County.

117.    UHG/Optum provides PBM services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.

118.    At all times relevant hereto, UHG/Optum offered pharmacy benefit management services and constructed standard formularies that are used throughout New Hampshire, including Strafford County. During the relevant time period, these formularies included opioids.

119. At all times relevant hereto, UHG/Optum offered mail order pharmacy services and dispensed opioids in New Hampshire, including Strafford County.

120. In 2021, UHG/Optum's mail order pharmacy was the fourth largest dispensing pharmacy in the United States and made $34.2 billion in prescription revenues.

121. From 2006-2014, UHG/Optum's mail order pharmacy bought over 4.5 billion MMEs of opioids spread over 252 million opioid dosage units.

122. Collectively, Evernorth Health, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts Specialty Distribution services, Inc.; Medco Health Solutions, Inc; Merck-Medco Managed Care, LLC; UnitedHealth Group, Inc.; OptumRx Inc.; OptumInsight Life Sciences, Inc.; The Lewin Group, Inc.; and OptumInsight, Inc. are referred to as "Defendants" or "PBMs".

**C.     The PBMs' Corporate Families Function as a Single Enterprise**

**1.     Express Scripts/Evernorth Corporate Family**

123. The Evernorth corporate family does not operate as separate entities. The public filings, documents, and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC, Medco, Express Scripts Specialty Distribution Services, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people." The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. The Evernorth enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to Plaintiff' causes of action in this Complaint.

124.    All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco, Express Scripts Specialty Distribution Services, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

125.    Evernorth and Express Scripts, Inc. actively control Express Scripts Administrators, LLC, Medco, ESI Mail Pharmacy Service, Inc., Express Scripts Specialty Distribution Services, Inc., and Express Scripts Pharmacy, Inc's operations, management and business decisions related to the at-issue formulary construction, data/analytics services, and mail order pharmacy services. Among other indicia of control and interconnectivity, during the relevant time period, these parent and subsidiaries have had common officers and directors:

(a)    Officers and/or directors that have been shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Secretary; Timothy Smith, Vice President; and Scott Lambert, Treasury Manager Director;

(b)    Executives that have been shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Secretary;

(c)    Officers and/or directors that have been shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Secretary; and Joanne Hart, Associate Treasurer;

(d)    Officers and/or directors that have been shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Secretary; Scott Lambert, Treasury Manager Director; and Joanne Hart, Associate Treasurer; and

(e)    Officers and/or directors that have been shared between Medco and Evernorth include David Queller, President and Senior VP of Sales & Accounting, Christine Houston, VP and COO, Timothy Smith, VP and Treasurer and all of the officers of Medco are also officers of Express Scripts, Inc.

126.    Evernorth also directly or indirectly owns all the stock of Express Scripts Administrators, LLC, Medco, Express Scripts Specialty Distribution Services, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.

**2.    The UHG/Optum Corporate Family**

127.    The UHG/Optum corporate family does not operate as separate entities. The public filings, documents, and statements of UnitedHealth Group presents its subsidiaries, including OptumRx and OptumInsight as divisions or departments of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. The UHG/Optum enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to Plaintiff' causes of action in this Complaint.

128.    All the executives of OptumRx and OptumInsight ultimately report to the executives, including the CEO, of UnitedHealth Group.

129.    UnitedHealth Group actively controls OptumInsight, and OptumRx's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services.

130.    Among other indicia of control and interconnectivity, during the relevant time period, these parent and subsidiaries have had common officers and directors:

(a)    Sir Andrew Witty is president of UnitedHealth Group and CEO of Optum, Inc.;

(b)    Dan Schumacher is president of Optum, Inc, the Chief Strategy and Growth Officer at UnitedHealth Group, Inc. and oversees OptumInsight;

(c)     Terry Strafford is a senior vice president and chief marketing officer at UnitedHealth Group and also oversees the branding, marketing, and advertising for UnitedHealth Group and Optum, Inc.;

(d)     Tom Roos serves as chief accounting officer for UnitedHealth Group and Optum, Inc.;

(e)     Heather Lang is Deputy General Counsel, Subsidiary Governance at UnitedHealth Group, Inc. and also Assistant Secretary at OptumRx, Inc.;

(f)     Peter Gill is Vice President at UnitedHealth Group, Inc. and also Treasurer at OptumRx, Inc.;

(g)     John Santelli leads Optum Technology, the leading technology division of Optum serving the broad customer base of Optum and UnitedHealthcare and also serves as UnitedHealth Group's chief information officer;

(h)     Eric Murphy is the Chief Growth and Commercial Officer for Optum, Inc. and has also led OptumInsight;

(i)     Timothy Wicks, CFO and Executive Vice President of Industry and Network relations for OptumRx, Inc. also held "executive management positions" with UnitedHealth Group "including operations product management and business development roles at UnitedHealthcare, OptumInsight and most recently, Optum Shared Services."

131.    UnitedHealth Group also directly or indirectly owns all the stock of OptumRx and OptumInsight.

132.    In addition, Opioid Manufacturers, including Purdue, expressly recognized that the UHG/Optum family operated as a single, unified enterprise that worked together to increase opioid utilization.

133.    For example, in 2003 a key executive in Purdue's role in creating opioid epidemic acknowledged ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

134.    The Purdue executive further noted in this email that he had done some

███████████████████████████████████████████████████████████████████

████████████████████████████

135.    Throughout the relevant time period, Purdue worked directly with OptumInsight,
UHC, and OptumRx together to further their mutual goals of promoting opioid use for the
treatment of chronic pain.

136.    One example occurred in ███████, when UHC and OptumInsight met with
Purdue to give a presentation on ██████████████████████████████ The
goal of this presentation was to ██████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████

137.    As a result of this meeting, in 2004 OptumInsight and Purdue ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

138.    OptumInsight and Purdue delivered this information through a series of
teleconferences, newsletter, faxes, live meeting, case study monographs, letters, and website and
web-based programming directly to physicians.

139.    The project, ████████████████████████████████

███████████████████████████████████████

        (a)   ████████████████████████████████████

        ███████████████

(b) 

(c)

(d)

(e)

140.    In addition to working together on joint opioid-chronic pain programs, another example demonstrating that the UHG/Optum corporate family acts as a single, unified enterprise is that when the ████████████████████████████████████████████



(a)

(b)

(c)

(d)

(e)

141.    Further evidence that the UHG/Optum operated as a unified enterprise is that in nearly all of its consulting and research efforts with the Opioid Manufacturers discussed below, OptumInsight utilized the ████████████████████████████████

████████████████████████████████████████████

███████████████████████

142.     Finally, UHG's executives also have oversight of and direct involvement in the UHG enterprise-wide formulary construction—including for UHC and OptumRx formularies—and the utilization management criteria that governed these formularies.

### IV.     FACTUAL ALLEGATIONS

**A.     Background on the Opioid Manufacturers' Role in the Opioid Epidemic**

143.     The Opioid Manufacturers manufactured a number of opioids that were responsible for creating and perpetuating the opioid epidemic.

144.     Opioids are dangerous pain medications that, for the most part, are classified as Schedule II drugs. The United States Drug Enforcement Administration defines Schedule II drugs as "drugs with a high potential for abuse, with use potentially leading to severe psychological or physical dependence. These drugs are also considered dangerous."

145.     Beginning in the 1990s, the Opioid Manufacturers began a campaign to expand the opioid market by disseminating fraudulent and misleading messages to reverse the popular and medical understanding of opioids and risks of opioid use as appropriate only in cancer and palliative care treatment.

146.     For decades, the Opioid Manufacturers spent millions of dollars to convince the market that opioids were appropriate and safe for chronic pain and other non-cancer pain treatments and were not addictive even when taken regularly to treat chronic pain by:

(a)     downplaying the serious risk of addiction;

(b)     creating and promoting the imaginary concept of "pseudoaddiction," and advocating that when signs of actual addiction begin to appear, the patient should be treated with more opioids;

(c)     exaggerating the effectiveness of screening tools to prevent addiction;

(d)     claiming that opioid dependence and withdrawal are easily managed;

(e)     denying the risks of higher dosages;

(f)      describing their opioid products as "steady state" – falsely implying that these products are less likely to produce the high and lows that fuel addiction – or as less likely to be abused or result in addiction;

(g)      touting the effectiveness of screening or monitoring patients as a strategy for managing opioid abuse and addiction;

(h)      stating that patients would not experience withdrawal if they stopped using their opioid products;

(i)      stating that their opioid products are effective for chronic pain without disclosing the lack of evidence for the effectiveness of long-term opioid use; and

(j)      stating that abuse-deterrent formulations are tamper- or crush-resistant and harder to abuse or misuse.

147.    The Opioid Manufacturers disseminated these messages through their sales representatives, in mass mailings to physicians and patients, in speaker groups led by physicians recruited for their support of their marketing messages, through unbranded marketing, through industry-funded front groups, and through Opioid Manufacturer-funded organizations such the American Pain Foundation ("APF"); the American Academy of Pain Management; the American Pain Society ("APS"), the American Geriatrics Society ("AGS"), and the Pain Care Forum ("PCF").

148.    As explained in detail *infra*, Express Scripts and UHG/Optum worked directly with the Opioid Manufacturers to create and disseminate these messages.

149.    In addition, as explained in detail *infra*, throughout the relevant time period the Opioid Manufacturers paid Express Scripts and UHG/Optum to ensure that their opioids had unrestricted access to and were among the most—if not the most—available forms of pain treatment on the market.

150.    The fate of the Opioid Manufacturers has been well documented. They have faced civil and criminal liability, filed for bankruptcy, will expend billions of dollars in an effort to repair the damage it has caused, and their founders and executives have been disgraced.

151.     But the Opioid Manufacturers did not act alone.

**B.      The PBMs Played a Central Role in Causing the Opioid Crisis**

152.     Opioid Manufacturers cannot influence drug prescribing and utilization alone. They require other participants in the drug distribution and reimbursement system to play key roles in the management, distribution, prescription and reimbursement of opioids.

153.     PBMs arguably play the most critical role in the pharmaceutical system.

154.     The PBMs have substantial market share in the pharmacy benefit market both nationwide and within New Hampshire. Nationwide, Express Scripts and Optum/UHG currently control approximately 60% of the market, covering 166 million lives. Together, the Defendants administer the prescription benefits for millions of New Hampshire residents as well, including tens of thousands of Strafford County residents.

155.     The PBMs Express Scripts and UHG/Optum are essential because they link Opioid Manufacturers to prescribing physicians, pharmacists, payors, and patients with the objective of influencing drug utilization. As recognized by their own internal presentations, the services and products offered by these PBMs ██████████████████████████████████████ ████████████████████████

156.     This chart illustrates the central role the PBMs play in the prescription drug market:



157.     The PBMs' functions include: (a) negotiating rebates and other fees from drug manufacturers based on their clients' drug utilization; (b) designing their health plan clients' benefit rules (such as copay levels, deductibles, and formulary specifics) and determining coverage eligibility and copayments; (c) designing, developing and managing formularies and formulary compliance programs; (d) determining which generic drugs are available and the amount of reimbursement received from and paid to pharmacies for generics; and (e) adjudicating claims at the point of sale, including determining eligibility for benefits and conducting concurrent and retrospective drug utilization review ("CDUR" alleged below). Regardless of the nominal control that some clients may retain over these functions, in reality many (if not most) of their clients have delegated and defer to the PBMs for the day-to-day control over these functions.

158.     As alleged in more detail herein, the Defendant PBMs represent that: (a) they negotiate formulary placement and rebates on behalf of their clients and for their clients' benefit

and (b) the PBMs' rebate negotiations and formulary decisions promote safe drug dispensing and the health of their client's members. Neither of these representations are true.

159.    Rather, the PBMs have worked with the Opioid Manufacturers in myriad ways to increase opioid utilization—despite knowing that opioid overutilization was causing a public health crisis nationwide—because the PBMs generate more profits the more opioids that are dispensed and sold.

### 1.    The PBMs Profit From Each Brand and Generic Opioid Dispensed

160.    Express Scripts and UHG/Optum are incentivized to increase utilization of both brand and generic opioids.

161.    On the brand side, the Opioid Manufacturers pay Express Scripts and UHG/Optum fees in the form of rebates, administrative fees, inflation fees, market share fees, and other incentives in exchange for favorable formulary placement (discussed in greater detail below) and unrestricted access to the market for their opioids.

162.    The Opioid Manufacturers pay these rebates and fees to Express Scripts and UHG/Optum based on a percentage of the opioid's list price and based on the volume of opioids dispensed to the PBMs' clients.

163.    Thus, the more expensive an opioid is and the more opioid pills dispensed, the more money the PBMs receive in rebates and fees from the Opioid Manufacturers.

164.    And the PBMs generally pass through only a portion of these rebates and fees to their clients and retain the rest for themselves as profits.

165.    For example, a March 2019 Pew Center study analyzed manufacturer rebate levels, health-plan drug expenditures and PBM revenues from drug expenditures during the period 2012-2016. That study found that, even though manufacturers paid greater rebates during the period 2012-2016, those rebates did not actually reduce health-plan expenditures on drugs—which

increased by 66% from 2012-2016. The report observed that as clients were being forced to spend more and more on drugs, PBM revenues virtually doubled because they retained increased percentages of payments from drug manufacturers for themselves and increasingly took their payments from manufacturers in the form of rebates and other fees that they did not share with their clients.

166. In addition, documents produced by the PBMs and Opioid Manufacturers in the case *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804-DAP (N.D. Ohio) and other opioid litigation, ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

167. The amount of rebates and fees that the Opioid Manufacturers pay to the PBMs each year is staggering. For example, in 2010, for a single year of a single opioid's utilization (OxyContin), Purdue paid nearly ████████████████. And the PBMs retain a significant portion of this amount in profit.

168. Notably, the PBMs typically negotiate a master rebate agreement on behalf of all their clients, with these agreements often covering tens of millions of lives. These negotiations are of such great financial importance to Opioid Manufacturers and the PBMs that they are often attended to by senior executives up to and including the chief executives which has also facilitated the formation of personal business relationships and an understanding of the common purpose of the negotiations between the Defendant PBMs and the Opioid Manufacturers.

169. Further, the PBMs have written in their client agreements that they are negotiating rebate and fee agreements on their own behalf and not on behalf of their clients. For example, Express Scripts' standard client contracts contain the following language: ████████████

███████████████████████████████████████████████████████

31

███████████████████████████████████████████████

█████████████████████████ UHG/Optum's contracts contain similar language.

170.    Thus, while a PBM represents that it is "hired by" and "working for" their clients, in reality the Defendant PBMs have more accurately been aligned with furthering the interests of the Opioid Manufacturers during these negotiations. In fact, Express Scripts' contracts with Opioid Manufacturers require the payment of an administration fee in exchange for Express Scripts

███████████████████████████████████████████████

███████████████████████████

171.    On the other side, Express Scripts' standard contracts with their clients provide that Express Scripts be given full and complete control to negotiate with drug makers for the insurer/health plan client, that the client must forego any right to directly negotiate with the drug makers. If the client does negotiate on its own, then the PBM may terminate the relationship or the client may have to forego all its share of rebate payments:



172.    Thus, Express Scripts will work for a client only so long as it agrees to: (a) abstain from using its right to negotiate rebates for its purchases without Express Scripts' written permission; and (b) give Express Scripts de facto control over negotiations regarding rebates or any other forms of payment.

173. These contract provisions, along with the market power of the PBMs compared to their clients, have incentivized the PBMs to negotiate deals with the Opioid Manufacturers for the payment of substantial rebates and other fees for each opioid sold.

174. In addition, the terms of the agreements between Opioid Manufacturers and the Defendant PBMs are considered extremely confidential by the PBMs and are not even disclosed to their health plan clients. As such, until key highly confidential documents were obtained only recently during discovery in *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-2804-DAP (N.D. Ohio) and other opioids litigation, there has been little public understanding about how these agreements impacted access to the opioids flooding American households.

175. During the relevant time period, the PBMs made millions of dollars every year by increasing the amount of brand opioids dispensed and sold.

176. On the generic side, Express Scripts and UHG/Optum make substantial profits as well through their interactions with, and operation of, mail order and retail pharmacies. At all times relevant hereto, Express Scripts and UHG/Optum were operating mail order pharmacies and dispensing generic opioids through their own pharmacies. The more generic opioids sold through their mail order pharmacies, the more profits the PBMs made.

177. In addition, as pharmacy benefit managers, Express Scripts and UHG/Optum set the price paid by their clients for generic opioids. The PBMs also set the price they paid to pharmacies in their retail pharmacy network for the same drugs. The PBMs routinely set the price that their clients paid them for generic opioids higher than what they paid their network pharmacies and then pocketed this pricing spread for each generic opioid dispensed. In this way Express Scripts and UHG/Optum profit from every generic it sells or reimburses as well.

178. Thus, for every generic and brand opioid, Express Scripts and UHG/Optum make more money, the more opioids that are dispensed and sold.

**2.      Because the PBMs Profit from Increasing Opioid Utilization, the PBMs Established Formularies Which Have Allowed Largely Unrestricted Access to Opioids**

**a.      PBMs' Role in Designing and Managing Formularies**

179.    Formularies are one key method that the PBMs use to control drug utilization. A drug formulary is a list of preferred generic and brand name prescription drugs that PBMs ensure are covered by their clients. If Express Scripts chooses to exclude a drug from its formulary, Express Scripts' clients using that formulary will not pay for that drug for their members at the pharmacy counter.

180.    Not all drugs listed on a formulary are treated equally. Formularies are often divided up into tiers which determine consumers' cost-share amounts. The lower tiers (which are reserved for generic and preferred brands) have lower cost share amounts than the higher tiers, which is to say that a drug on tier one will be less expensive for a patient than a drug on tier three.

181.    Preferential formulary treatment, such as being listed on a lower tier, increases a drug's utilization, since patients are generally more likely to pick the lower cost alternative.

182.    Most clients rely entirely upon the Defendant PBMs' formulary and UM recommendations.  A well-known pharmacy-benefits consultant, ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████   The PCMA—the PBM trade association—has testified to the Pennsylvania House of Representatives that even sophisticated clients rely almost entirely on PBMs to manage their drug benefit.

183.    The Defendant PBMs' control over formulary decisions has been a key contributor to the ongoing relationship and cooperation with the Opioid Manufacturers, because the manufacturers pay rebates and other fees based on the Defendant PBMs' ability to deliver formulary placement for their drugs. Because favorable formulary status increases a drug's usage

and sales, and formulary exclusion (or a downgrade in formulary position) reduces a drug's usage and sales, the rebates and other fees are conditioned on a drug's formulary status. As Cottingham & Butler (a national insurance broker) noted in a client presentation, PBMs have ██████████████ ████████████████████████████████████████████████

184.    The Defendant PBMs and the Opioid Manufacturers regularly discussed and agreed about which, if any, UM measures would be utilized for particular opioid drugs. If they had been implemented, the UM measures would have helped control the flow of prescription drugs from the prescriber, through the pharmacy and ultimately to the patient whose prescription plan the PBMs administer. These measures include days' supply quantity and daily dosage limits, refill limits, prior authorizations (which require additional PBM approval before drug is dispensed) and step edits (which require that a patient try a different, safer drug before being given a more dangerous one).

185.    The Defendant PBMs maintain internal committees that determine which drugs are placed on formularies. These committees are comprised of company personnel. Express Scripts refers to this committee as the Value Assessment Committee and UHG/Optum refers to this committee as the Formulary Management Committee.

186.    These committees construct the PBMs standard, national formularies that most clients rely on to determine which drugs are available and at what price for their members. In doing so, these PBMs committees interact with internal data and analytics departments in making these decisions. In particular, ███████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████

187.   In addition, the Defendant PBMs have trade relations employees who are responsible for negotiating rebate agreements with drug manufacturers. Express Scripts refers to this committee as the Trade Relations Group and UHG/Optum refers to this committee as the Industry Relations Group. The Trade Relations Group and Industry Relations Groups work with both formulary committee members and the analytics teams to ensure that they contract with Opioid Manufacturers in a manner that is the most profitable for the PBMs.

       **b.**     **PBMs Represent That They Design Formularies that Promote Safe Drug Use**

188.   The Defendant PBMs represent: (a) that they negotiate formulary placement and rebates on behalf of their clients and to promote their members health rather than lining their pockets with rebates and other fees and (b) the manufacturer payments and formulary decisions they enact are in accordance with their clients' interests of ensuring safe and clinically appropriate drug dispensing.

189.   Over more than the last two decades, the Defendant PBMs have marketed themselves to their clients as ensuring that appropriate drugs are being dispensed and that the PBMs work to promote the health and safety of their clients' members. For example, in a September 2013 letter to the Pennsylvania House of Representatives Committee on Health, Express Scripts stated that "[o]ur company's mission is to make prescription drugs safer and more affordable."

190.   In addition, Express Scripts code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to patients and clients . . . This commitment defines our culture,

and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable."

191.    Likewise, OptumRx's parent company, UHG, represented through its CEO Steve Hemsley in its 2013 Annual Report that "UnitedHealth Group's capabilities continue to grow to serve and enable a more effective, modern health care system, and to respond to a national imperative to improve the performance of health care and reduce its costs."

192.    Most clients (if not all) rely almost entirely on the Defendant PBMs' formulary recommendations because, as alleged more fully herein, they do not have clinicians on staff and/or they do not have complete information about all of the PBMs' negotiations with, and payments from, drug manufacturers. Consequently, they often do not even question their PBM's formularies, much less design their own.

193.    Despite the PBMs' representations that they negotiate rebates and make formulary decisions on behalf of their clients, for their clients' benefit, and consistently with their clients' interests in providing safe and affordable drugs, the PBMs have not actually done so. To the contrary, the PBMs have used their power to negotiate rebates and other fees, to control the formulary structures, to refrain from implementing Utilization Management measures, all in an effort to allow the Opioid Manufacturers unfettered access to their formularies so that the number of opioids prescribed and sold could continue to grow and generate profits for the PBMs and the Opioid Manufacturers. Even though that is contrary to their clients' interests, the PBMs persisted and brought the opioid epidemic to the doorstep of nearly every household in America.

### c.    PBMs' Established Formularies Which Have Allowed Largely Unrestricted Access to Opioids

194.    As noted above, the Defendant PBMs have controlled access to opioids through formulary placement. Preferential formulary placement, such as being listed on a lower cost tier,

increases a drug's utilization, since patients are generally more likely to pick the lower cost alternative. Additionally, PBMs have controlled access to opioids through UM measures they utilize (or elect not to utilize) through their formularies. When implemented properly, UM measures could have restricted much of the flow of opioids entering the market.

195.    Since at least 2000, each of the Opioid Manufacturers negotiated rebates and other fees with Express Scripts and UHG/Optum to secure preferred formulary placement for their opioid products.

196.    For example, throughout the relevant time period, by far the largest payor for OxyContin in the commercial market was Express Scripts. In fact, up to and through the mid-2010s, ▮▮▮▮▮ of the OxyContin sold in the commercial channel was sold and dispensed to Express Scripts' clients. And during this time, the majority of Express Scripts' formularies placed OxyContin on the most preferred brand formulary tier, with no restrictions. Likewise, for most of the relevant time period, UHG/Optum also granted OxyContin unrestricted, preferred formulary status for most of its standard formularies. Over time, each PBM would coordinate a similar deal for rebates and other fees with each of the Opioid Manufacturers to give their branded or generic opioids the most optimal formulary placement possible.

197.    Express Scripts and UHG/Optum have been so successful in working with the Opioid Manufacturers to optimize their common purpose between formulary placement/utilization management and rebates and other fees that payments have reached as high as ▮▮▮▮▮ off the drug's list price in recent years for some opioid drugs.

198.    The Opioid Manufacturers early on recognized that Express Scripts and UHG/Optum would work cooperatively with them to optimize the relationships between formulary decisions and Utilization Management (on the one hand) and the size of rebates and other fees and rebates (on the other hand). For example, in a candid ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



199.    As a direct result of UHG/Optum and Express Scripts' collaborative efforts with Purdue, OxyContin sales skyrocketed in the early years, jumpstarting the entire opioid epidemic.

200.    The OxyContin market grew from $48 million in 1996 to over $1 billion in the early 2000s. The high availability of OxyContin created by Defendants and Purdue correlated directly with increased abuse, diversion, and addiction, and by 2004 OxyContin had become a leading drug of abuse in the United States.

201.    In addition to brand name opioids, such as OxyContin, the PBMs also granted unrestricted, tier one formulary status on nearly all of their formularies for generic opioids throughout the relevant time period because the PBMs profits increased the more generic opioids that were sold, despite knowing that dangerous amounts of generic opioids were flooding into communities.

**3.      The PBMs and Opioid Manufacturers Use Parity Terms in Their Rebate Agreements to Ensure There Is a Common Purpose of Unfettered Access to the Opioid Drugs**

202.    Throughout the negotiations with the Opioid Manufacturers, the PBMs have agreed that, in exchange for rebates, the PBMs would not "disadvantage" their opioid drugs, nor would they place UM restrictions on their use. Effectively, this meant that the rebate agreements all

required the lock-step application of Utilization Management measures, conditioning payment of rebates only if these limitations were applied to all other drugs in their formulary's competitive drug category. Rather, the parties agreed that none of the opioid drugs would be disadvantaged and that they all would have the same UM restrictions. These parity and disadvantaged contract terms had the effect of the PBMs and the Opioid Manufacturers sharing a common purpose of ensuring the unfettered access to opioids.

203.    Express Scripts' standard rebate agreements defined the term



204.    UHG/Optum's template rebate agreements had similar language

205.    For example,

_____

2 JAN-NYDFS-00001455181.



206.    In 2012 negotiations between ESI and Endo, the parties agreed that ███████

207.    The same parity terms are included in UHG/Optum agreements. For example, the 2011 Rebate Agreement between OptumRx and Johnson & Johnson ███████

208.    The 2012 OptumRx rebate agreement with Reckitt Benckiser for Suboxone Film required that it ███████

209.    Likewise, in 2012 negotiations between OptumRx and the drug maker Covidien with regard to tiering of its opioid drug, the parties agreed to use the OptumRx ███████



210.    The same was true for Teva's 2015 agreement with OptumRx, which required

211.    The 2016 agreement between OptumRx and Depomed

212.    The common purpose created by these lockstep parity terms for each of the PBM Enterprises was to tie limits on the use of Utilization Management measures across the entire class of opioids. The rebate agreements conditioned payment on each Opioid Manufacturer not being disadvantaged with regard to applying Utilization Management measures unless the entire market basket of all competing drugs was treated the same.

4.    **The PBMs Knew Opioid Epidemic Was Devastating Communities And That They Were Uniquely Situated to Prevent the Public Health Crisis**

213.    Express Scripts and UHG/Optum have had a front row seat to the unfolding opioid epidemic. The two companies have watched as the number of opioids prescribed and dispensed has exploded. Express Scripts and UHG/Optum were made aware of opioid epidemic through the vast amounts of data the two companies have had, the knowledge gained through their clients, manufacturers, and other entities in the health care arena, and through clinical evaluations for things such as formulary placement.

214.    Since at least the late 1990s, the PBMs tracked the opioid epidemic, pill-by-pill, as it unfolded in real-time.

215.    According to the CDC, the rise in opioid overdose deaths can be outlined in three distinct waves. As the CDC explains: "The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1993. The second wave began in 2010, with rapid increases in overdose deaths involving heroin. The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids, particularly those involving illicitly manufactured fentanyl."



216.    The PBMs saw these waves up-close. Long before the second wave of the crisis started in 2010, both Express Scripts and UHG/Optum knew that opioid abuse and misuse posed serious problems.

217.    In 2006, Express Scripts recognized the abuse risk opiates posed. But Express Scripts was reluctant to implement more robust monitoring for fear of customer blowback and loss of prescription volume:



44

218.    As early as 2008, Express Scripts acknowledged the acute diversion risk with opioids. For example, Express Scripts employee Adam Kautzner (now its President) noted ▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



219.    Furthermore, because of their business model, Express Scripts and UHG/Optum have had access to an extraordinary amount of data since the late 1990s/early 2000s.

220.    For example, in a 2013 interview with Express Scripts senior director for program integrity and senior manager for pharmacy analytics and reporting, titled "How Big Data Can Catch OxyContin Abusers and Bad Docs," Express Scripts is described in the following manner:

221.    In other words, for the past two decades Express Scripts has been tracking and analyzing data from over a billion prescription claims per year to determine if opioids are being overutilized, abused, and diverted. Express Scripts quite literally tracked the opioid epidemic unfolding in real time.

222.    Another example of Express Scripts' nationwide data efforts is its 2014 "Nation in Pain Report," which reviewed 36 million pharmacy claims from 2009 to 2013 in demonstrating the widespread opioid epidemic. The Report concluded, among other things, that "Prescription rates for opioids increased dramatically in the past two decades . . ." and that "Opioid abuse is an epidemic in the U.S."

223.    Express Scripts acknowledged internally that advertising its data capabilities to track the opioid epidemic could be problematic. Yet—as discussed in detail below—for years after the 2014 study (and the 2016 CDC Guidelines), Express Scripts took no material steps to change its formularies to appropriately manage opioid usage.

224.    UHG/Optum, through both their PBM claims data, and through the data compiled and analyzed by OptumInsight (described in greater detail below) also had access to and analyzed data relating to billions of prescription claims and have recognized for over a decade that opioids were being overutilized and diverted.

225.    Not only that, but the PBMs were well aware for years that as much as 80% of addicts started out on a prescription drug. Below is a slide from a presentation done by the OptumRx Chief Pharmacy Officer ████████████████████████████████



226.    UHG/Optum has had access to this data for its 66 million UHC and OptumRx covered lives for the duration of the relevant time period.

227.    For example, in March 2017,



228. Calabrese's presentation discusses ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

229. Among the tools Calabrese suggests is the use of OptumRx's ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

230. UHG/Optum used its own claims data ███████████████████████

███████████████████████████████████████████████████

████████████████

231.    Express Scripts and UHG/Optum also track the number of opioids that move through their own mail order pharmacies.

232.    Thus, Express Scripts and UHG/Optum can see detailed information on individual prescribers and pharmacies, but can also aggregate that data across manufacturers, patients, pharmacies, and payors. Their visibility is both uniquely granular and comprehensive.

233.    Moreover, the PBMs also recognize that they were "uniquely situated" to prevent the opioid epidemic from occurring. In 2018, Express Scripts Vice President of Clinical Product Development testified before the U.S Senate in a hearing titled "The Opioid Crisis: The Role of Technology and Data in Preventing and Treating Addiction." At the hearing, this Express Scripts VP stated:

> [Express Scripts] manages the pharmacy benefits for more than 80 million Americans. . . [b]ecause Express Scripts interacts with patients, pharmacies, prescribers, and payers, our company is uniquely situated to collect data when patients receive and fill a prescription for a opioid under their pharmacy benefit. We can leverage that data across the care continuum in order to design interventions aimed at preventing opioid addiction from beginning in the first place.

234.    David Calabrese RPh, MHP, Optum's chief pharmacy officer in 2018 echoed this sentiment: ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████

235.    And yet, despite being acutely aware that opioids were causing a public health crisis and despite being "uniquely situated" to stop the opioid epidemic from unfolding, for years Express Scripts and Optum/UHG intentionally made the most dangerous opioids among the most accessible and available drugs on the market because it was profitable for them to do so.

**5.    Even Though the PBMs Knew the Opioid Epidemic Was Devastating Communities, the PBMs Failed to Undertake Actions That Would Have Drastically Reduced Inappropriate Prescribing and Dispensing of Opioids**

236.    Even as Express Scripts and UHG/Optum knew that opioid overutilization and abuse were creating a public health crisis, they failed to take actions that would have drastically reduced the inappropriate prescribing and dispensing of opioids.

237.    For example, in a November 3, 2016 email, Bob Lahman, Trade Relations VP at OptumRx, explained ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

238.    Yet, even while recognizing their role and responsibility to prevent opioid misuse, internal resistance continued. For instance, in a February 6, 2017 email, Nathan Merrill, the OptumRx Manager of Clinical UM Operations wrote to David Calabrese, the OptumRx Chief Pharmacy Officer ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████



239.    In a later 2017 email chain, ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████. In an April 14, 2017 email from Brian Sabin, Manager, Industry Relations, he responded ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████

240.    Even though UHG/Optum was publicly stating in early 2017 that it was using formulary measures to limit excessive use of opioids, by 2019 many of these limits were not yet in place because it meant the significant loss of rebates. At the time, this loss of rebates caused great consternation at UHG/Optum. An email exchange in March 2019 between ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████



241.    A March 1, 2019 response ███████████████████████████████

242.     UHG/Optum also provide discount drug cash cards so individuals can directly purchase medications without going through insurance companies. This allows individuals to fill multiple prescriptions while avoiding the oversight that insurance coverage brings, thus fueling the epidemic.

243.     UHG/Optum allow this loophole because they are paid for every prescription filled in this manner. PBM cash cards have been described as a "back door to America's opioid epidemic."

244.     For example, UHG/Optum's standing policy was not to place any restrictions on cash cards—despite its members' ability to purchase opioids unrestricted through these cards. When a UHG/Optum executive proposed ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

245.     Upon information and belief, UHG/Optum did not put any limitations on the use of cash cards to purchase opioids until at least 2018.

246.     Express Scripts likewise resisted any limits that threatened rebates and other fees. For example, ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████

247.     ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████

248.     In 2003, one of Express Scripts' largest customers at that time was UHG/Optum's insurance arm, UHC. ███████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

249.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

250.     Based on the joint efforts of Purdue, Express Scripts, and OptumInsight—and despite expressly acknowledging that its failure to restrict the amount of OxyContin dispensed was leading to abuse and diversion—UHC subsequently doubled ███████████████████

████████████████████████

251.     OxyContin sales were so rampant at Express Scripts that in 2013 Express Scripts' executives acknowledged that Express Scripts was ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

252.     In an additional statement in 2013, Express Scripts further represented that ████████████████████████████████████████████████████

████████████████████████████████████████████

253.     In an internal Express Scripts email in April 2017 discussing clients that wanted to add utilization management to Purdue products on their formularies, one Express Scripts' executive stated, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

54

254.     Another example occurred in a 2017 email chain, where several Express Scripts employees ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Janelle Kuntz, the Express Scripts Clinical Director for the Office of Clinical Evaluation & Policy, stated that██████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████ Nancy Pehl, Senior Director, Drug Evaluation Unit Office of Clinical Evaluation & Policy at Express Scripts, responded ██████████████████████████ ██████████████████████████████████████████████

255.     Even in the early 2010s when the federal government began advising that the PBMs place controls on opioids for formularies utilized in federal programs (such as Medicaid and Medicare), the PBMs still refused to place such controls on their commercial plans.

256.     In sum, in exchange for lucrative financial benefits from the Opioid Manufacturers, Express Scripts and UHG/Optum have stoked the opioid epidemic by allowing unfettered access on their formularies to dangerous, highly addictive opioids with minimal, if any, restrictions

**6.     The PBMs Failed to Block Access to Opioids Through Their CDUR Programs**

257.     In addition to the PBMs' dominion over formularies and modifications thereto is the PBMs' related control over the management of patient's prescription benefit claims. According to Express Scripts' standard, uniform contract with their clients, Express Scripts is responsible for processing patients' initial benefit claims (such as requests at the pharmacy counter for insurance coverage regarding a prescription) and prior authorization requests.

258.     For the entire relevant time period, Express Scripts had the ability to place CDUR edits and other UM, including prior authorizations, quantity limits, refill limits, and step edits, on opioids that would have greatly restricted that amount of opioids that entered into communities.

259.    Express Scripts knew that placing "hard edits" such as prior authorizations on opioids greatly reduced their utilization. For example, in 2003, Express Scripts conducted a study on the effectiveness of prior authorizations on one of its larger client's population and found that ███████████████████████████████████████████████ Yet Express Scripts failed to implement effective UM and CDUR "hard edit" protocols for decades after this study, ██████ ███████████████████████████████████████.

260.    Evidence is now available showing that the rebate monies had a direct impact on how the PBMs managed access to opioids, including their obligations to monitor on a real-time basis through concurrent drug utilization review ("cDUR") that only safe and appropriate opioid prescriptions would be filled.

261.    Even while they were lining their pockets with rebates and other fees from the Opioid Manufacturers, the PBM Defendants failed to perform their contractually driven cDUR services for their clients at the point of sale.

262.    "Concurrent DUR" or "cDUR" involves the real-time evaluation of drug therapy and intervention, if necessary, while the patient is undergoing therapy, including screening at the point of sale for potential drug therapy problems due to therapeutic duplication, age/gender-related contraindications, over-utilization and under-utilization, drug-drug interactions, incorrect drug dosage or duration of drug therapy, drug-allergy contraindications, and clinical abuse/misuse.

263.    ESI's standard cDUR term in its client agreements has required it to conduct concurrent DUR at the point of sale on all prescriptions before allowing them to adjudicate. According to the ESI standard PBM Agreement:



264.    The OptumRx standard PBM Agreement has included similar cDUR requirements:



265.    Despite these contractual obligations, the PBM Defendants failed to perform effective cDUR services on the Opioid Manufacturers' products because doing so would have impacted their receipt of rebates and other fees, even though doing so would have dramatically reduced medically inappropriate prescribing and dispensing of prescription opioids. For years, the PBMs failed to abide by or implement effective cDUR and other UM to ensure that only

appropriate opioid prescriptions were being dispensed in pharmacies across the country (including in their own mail order pharmacies).

266.    Even when plans attempted to place cDUR and/or UM dosage limits on excessive use of opioids, Express Scripts and UHG/Optum worked with the Opioid Manufacturers to push back with high-writer physician letter-writing campaigns and direct objections to their clients. In a telling exchange in 2002, when Highmark Blue Cross Blue Shield ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

267.    At the same time, the PBMs and Opioid Manufacturers conspired to hide the truth from their clients—*i.e.*, plans could not be told that the PBMs' true motive was receipt of manufacturer rebates. An August 29, 2002 ████████████████████████████

████████████████████████████████████████████

██████████████████

268.    Both Express Scripts and UHG/Optum have been well aware for years that the "soft edit" cDUR services that they did have in place did little to nothing to block pill seekers from gaining access to inappropriate prescriptions.

269.    For example, on August 25, 2015, the director of Express Scripts fraud, waste, and abuse program wrote to a senior director of Express Scripts' clinical policies expressing ████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

270.    In another example, an Express Scripts' fraud, waste and abuse investigation using its data mining and analytics tools for its client ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ Despite these clear examples of gross over dispensing, Express Scripts did little to limit the flow of opioids.

271.    Even when the FDA in 2013 removed the indication for use of long-acting narcotics to treat moderate pain, Express Scripts saw no reason to change its cDUR program, ████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

272.    Several years later, in 2016 when Express Scripts tried to implement cDUR limits on Purdue's drugs, ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

273.    UHG/Optum, too, was unwilling to implement cDUR changes because doing so would impact its receipt of rebates. In 2017, when OptumRx tried to implement changes which would have used cDUR to control inappropriate opioid usage, there was pushback because it would mean the loss of rebates. In response to these concerns, on March 24, 2017, ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

274.  ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████[3]

275.  ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

---

[3] *Id.*

7.      **Express Scripts and UHG/Optum Assisted the Opioid Manufacturers in Marketing Their Products**

a.      **PBMs' "Pull Through" Efforts with the Opioid Manufacturers**

276.    Once the Opioid Manufacturers gained favorable formulary placement through rebate agreements, they dispatched their sales representatives to "pull through" the agreements to increase sales of their drugs. To assist in these marketing efforts, Express Scripts and UHG/Optum have for years provided these manufacturers ███████████████████████████

█████████████████████████████████████        The Opioid Manufacturers used this data targeted-pull through marketing to the highest opioid prescribers. For example, according to one 2009 email to Endo sales representatives, ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████

277.    In another example, █████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

278.    There is also clear evidence that has come to light that Express Scripts and UHG/Optum also actively participated in the Opioid Manufacturers' marketing efforts. For example, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

279.    In addition, beginning in 2006, Express Scripts and Purdue entered into an ongoing

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

**b.      PBMs Conspired with the Opioid Manufacturers through Research and Consulting Agreements**

280.    There is also clear evidence Express Scripts and UHG/Optum further helped create and exacerbate the opioid epidemic by providing consulting, marketing, and research strategies and tactics to the Opioid Manufacturers to help reconfigure the narrative about the addictive nature of opioids and what constitutes "appropriate" use for these dangerous drugs—i.e., the precise activities that have resulted in civil—and at times criminal—liability for the Opioid Manufacturers.

281.    For example, ███████████████████████████████████████

██████████████████████████████████

282.    In the late 1990s, █████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ Following these efforts, the sales for

OxyContin increased, while those for the competing product declined.

283.    Starting in the early 2000s and continuing for at least a decade, Express Scripts and

Purdue also worked together on ████████████████████████████████████

████████████████████████████████████████

284.    One example occurred in 2000 and 2001, when Express Scripts-Purdue created

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

285.    At the time, Purdue stated internally ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████

286.    In addition, starting in the 1990s and continuing for decades, Express Scripts also

worked as the administrator and mail order pharmacy for Purdue's ███████████████

██████████████████████

287.    The parameters for this program created by Purdue and Express Scripts allowed a

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

288.    The ████████ raised numerous red flags, including dispensing large amounts of opioid to individuals, failing to conduct proper due diligence on patients, inappropriately recording deaths, and rerouting prescriptions to get around state laws.

289.    For example, in 2010, Purdue audited Express Scripts' administration of this program and found numerous failures by Express Scripts ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████

290.    Express Scripts also worked directly with Purdue and the other Opioid Manufacturers in a research and consulting capacity.

291.    In the late 1990s and early 2000s, Purdue executives sought out Express Scripts and Medco because of the ████████████████████████ to conduct research and provide drug utilization data to Purdue and to strengthen Purdue's relationship with these entities.

292.    In August of 2000, ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████.

293.    ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

294.    In the early 2000s, Express Scripts provided research to Purdue to support its efforts to expand the OxyContin market, including related to opioid utilization patterns and the value of OxyContin in treating osteoarthritis.

295.    UHG/Optum also Partnered with Purdue and the other Opioid Manufacturers to increase opioid utilization.

296.    From early on Purdue's internal marketing plans focused on partnering with UHG/Optum because ███████████████████████████████████████████████

297.    For decades, UHG/Optum knew opioids were not effective treatment for chronic pain and were highly addictive.

298.    Despite that knowledge, starting in at least the 1990s and continuing for decades, UHG/Optum provided Purdue research and evidence to support its efforts to expand the opioid market into and to promote the benefits of opioid use to treat chronic pain, low back pain, and osteoarthritis. Examples include:

299.    In July 2000, ████████████████████████████████████



300.    In October 2001, again relying on UHC data, OptumInsight engaged in a study for Purdue titled, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

301.    In May 2003, Purdue paid OptumInsight to conduct a study titled, ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

302.    In March 2005, Purdue paid OptumInsight to conduct a study, ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

303.    During these same years, OptumInsight, Purdue, and UHC also developed a series
of teleconferences to be presented to healthcare providers on opioid use for ████████████
████████████████████████████ for continuing education credits. The purpose of these
teleconferences was to promote the benefits of opioids for chronic pain.

304.    The messages UHG/Optum was to deliver to these pain doctors during these
teleconferences included that opioids were effective to treat chronic pain, that chronic pain should
be treated aggressively, and that opioids were not addictive.

305.    Part of this effort included UHC accepting a $████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████

306.     In May of 2007, the Purdue Frederick Company—the parent of Purdue Pharma,
L.P.—pled guilty in the Western District of New Hampshire to charges related to the misbranding
of OxyContin. At that time, Purdue agreed to a Corporate Integrity Agreement with the Office of
Inspector General of the U.S. Department of Health and Human Services ("HHS"). Pursuant to the
agreement, for a period of five years, ending in 2012, Purdue was obligated to retain an
Independent Monitor and submit yearly compliance reports concerning its marketing and sales
practices and training of sales representatives with regard to their interactions with health care
providers.

307.     In 2010, as Purdue's Corporate Integrity Agreement was near its end,
OptumInsight's work with Purdue accelerated. Purdue engaged OptumInsight to jump start the
rebranding and promotion of the reformulated and "abuse deterrent" Oxycontin, in addition to
promoting additional Purdue opioids.

308.     From 2010 to at least 2015, UHG/Optum worked on in-depth marketing strategies
and generated evidence to support Purdue's reformulated OxyContin, as well as Butrans,
Intermezzo, Targin, and Hydromorphone, with the public, patients, healthcare providers and
payors.

309.     The goal of these joint efforts was to: (i) push back against addiction concerns; and
(ii) identify the best way to position these drugs with the public, patients, providers, and payors in
order to increase utilization and maximize sales in the chronic pain market. With respect to
OxyContin, one of Purdue's goals was to demonstrate the effectiveness of Purdue's new "abuse-
deterrent" formulation in preventing abuse.

310.    These efforts involved multiple stages over the course of five years including:

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

311.    This multiyear effort—continuing until at least 2015—involved UHG/Optum creating what it called a ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

312.    In other words, OptumInsight generated aspirational/marketing statements first— such as ████████████████████████████████████████████

█████████████████████████████████████████

313.    In sum, for over a decade UHG/Optum partnered directly with Purdue to:

(a)    Overstate the benefits of opioids for chronic pain;

(b)    Downplay the risks of addiction;

(c)    Promote the concept of "pseudoaddiction"

(d)    Claim that opioid dependence and withdrawal are easily managed;

(e)    Deny the risks of higher opioid dosages; and

(f)    Exaggerate the effectiveness of "abuse-deterrent" opioid formulations in preventing abuse.

314.    UHG/Optum's Opioid Manufacturer support was not limited to Purdue. It also provided data and research to Indivior, Endo, Teva, and J&J/Janssen to expand their efforts to increase opioid utilization for chronic, non-cancer pain. For example:

315.    From 2007 through at least 2014, UHG/Optum provided data and research to

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████ for misrepresentations in its marketing and

Indivior's CEO pled guilty to federal charges as a result of a federal indictment which included

allegations related to Indivior's misrepresentations regarding diversion, misuse, and abuse.

316.    From 2007 through at least 2014, UHG/Optum executed several consulting

agreements and statements of work with Janssen/J&J ████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████

317.    From 2009 through at least 2016, UHG/Optum worked with Teva to provide

████████████████████████████████████████████████████

318.    In at least 2007, UHG/Optum worked with Endo to provide research ██████████

██████████████████████

319.    As a result of these joint efforts between Express Scripts, UHG/Optum, and the

Opioid Manufacturers, opioid utilization exploded from the late 1990s until at least 2015.

## C.    The PBMs' Mail Order Pharmacy Activity Further Exacerbated the Opioid Crisis

320.    Express Scripts and UHG/Optum also operate two of the largest pharmacies in the

country that have purchased, dispensed and profited from the movement of the brand and generic

opioids at issue in this litigation.

321.    As such, Express Scripts and UHG/Optum are part of the closed system and are

required to comply with the provisions of the Controlled Substances Act ("CSA") and New

Hampshire laws.

322.    Defendants have invested the funds to organize and open their mail order pharmacies and play a very active role in the management of those pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

323.    Express Scripts' and UHG/Optum's obligations as registrants include the responsibility to maintain effective controls against diversion of opioids. 21 C.F.R. § 1301.71(a). This includes an obligation to use the information available to them, such as the vast amounts of prescription and prescriber data they maintained or could access, to prevent the diversion of opioids. Upon information and belief, Express Scripts and UHG/Optum failed to utilize this data to detect or guard against diversion, and otherwise failed to meet their CSA obligations.

324.    Defendants, as sophisticated owners of multiple mail order pharmacies, had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Its own data would have allowed Defendants to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

325.    Rather than use this data to identify problematic utilization and prescribing patterns, Defendants sold this data to third party vendors who in turn resold this data to drug makers like Purdue Pharmaceuticals. Drug makers used this data to stoke increased sales of opioid drugs to physicians throughout America to treat the "fifth vital sign"—requiring healthcare providers to ask every patient about their pain, given the perception at the time was that pain was undertreated. Since that time, the U.S. has experienced a surge in opioid prescriptions—and, subsequently, an increase in overdoses and deaths tied to these painkillers.

326.    Yet, there is no evidence Defendants ever leveraged their resources and troves of information to stop or further question the wildly inappropriate prescriptions being written by prescribers.

327.    Defendants failed to fulfill their duties as the last line of defense and failed to ensure that the prescriptions it was filling were issued to a legitimate patient for a legitimate medical purpose by a practitioner acting in the usual course of professional practice, as is evident by the copious amounts of opioids being dispensed by Defendants' mail order pharmacies throughout the United States.

328.    From at least 2008 to the present (and ongoing), Defendants violated the CSA and the United States state pharmacy laws and regulations by dispensing controlled substances in violation of their corresponding responsibility under 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice under 21 C.F.R. § 1306.06.

329.    Defendants violated the CSA and the United States and state pharmacy laws and regulations each time their mail order pharmacies filled a controlled substance prescription without identifying and resolving those red flags.

330.    Express Scripts and UHG/Optum were also required to comply with New Hampshire's controlled substances law and pharmacy regulations. This includes, but is not limited to, ensuring that adequate safeguards were in place to dispense opioids in a safe and effective manner, providing effective controls and procedures to deter and detect theft and diversion, and complying with federal controlled substances laws, such as the requirement to maintain effective controls against diversion. Express Scripts and UHG/Optum failed to meet these obligations.

331.    Instead, during the 2006-2014 time period, Express Scripts and UHG/Optum pharmacies purchased more than 27 billion MMEs, spread over more than 1.4 billion dosage units according to the DEA's Automated Reports and Consolidated Ordering System ("ARCOS").



**National Mail Order MME by Manufacturer**
**ARCOS 2006-2014**

332.    The DEA ARCOS database reveals that over 49% of the 46+ billion MMEs moved through the PBM pharmacy or mail order channel were purchased by Express Scripts pharmacies. Specifically, during the 2006-2014 time-period, Express Scripts pharmacies bought over 22.9 billion MMEs spread over 1.1 billion opioid dosage units.

333.    Not surprisingly, given their lengthy collaboration with regard to OxyContin, over 26% of Express Scripts pharmacies' MME purchases were for Purdue opioids.

334.    23.63% of Express Scripts pharmacies' opioid purchases were for Teva opioids; 14.38% were for Mallinckrodt opioids; 8.34% were for Endo opioids; 4.78% were for Indivior opioids; and 4.59% were for Mylan opioids. Express Scripts pharmacies dispensed these opioid products by mail to patients nationwide, including in New Hampshire and Strafford County.



**Express Scripts Pharmacies MME by Manufacturer
ARCOS 2006-2014**

335.    The DEA ARCOS data also reveals that 9.6% of the 46+ billion mail order MMEs were purchased by UHG/Optum's pharmacies. Specifically, during the 2006-2014 time period, UHG/Optum pharmacies bought and sold over 4.5 billion MMEs spread over 252 million opioid dosage units.

336.    21.75% of UHG/Optum's pharmacy opioid purchases were for Mallinckrodt opioids; 17.27% were for Teva opioids; 15.76% were for Purdue opioids; 11.83% were for Endo opioids; and 4.95% were Indivior opioids. UHG/Optum dispensed these opioid products by mail to patients nationwide, including in New Hampshire and Strafford County.



337.    Express Scripts and UHG/Optum's pharmacies earn substantial profits from their purchase and dispensing of generic drugs, including the generic opioids at issue in this litigation. As a general proposition, drugs dispensed from mail order pharmacies account for a minority of Express Scripts and UHG/Optum's prescriptions but more than half of their per-prescription profits.

338.    They earn these profits in assorted ways, including but not limited to manipulation of maximum allowable cost (MAC) pricing lists; spread pricing practices; repackaging; and negotiating discounts for generic purchases that are not shared with their customers.

339.    The staggering volume of opioids dispensed by Express Scripts and UHG/Optum is not surprising, given how their mail order pharmacies operated to push virtually all prescriptions out the door, with little or no attempts at identifying or resolving red flags.

340.    For instance, employees at Express Scripts and UHG/Optum mail order pharmacies routinely complain of being under significant pressure to fill as many prescriptions as possible in as short amount of time as possible. In this vein, Express Scripts instituted a ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

341.    This ███████████ has acted as a carrot and stick for Express Scripts' pharmacists and technicians to fill as many opioid prescriptions as possible in as little time as possible, despite legal requirements to properly and adequately identify and resolve red flags.

342.    Activities such as placing calls to physicians or patients to verify prescription information were also strictly monitored for timing and efficiency, which came at the expense of meeting industry safety standards. For prescriptions that required phone calls to verify certain information, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

343.    UHG/Optum's mail order pharmacies had many of the same problems. Many pharmacists and technicians were fielding ████████████████████████████████████████████

███████████████    Even though not all calls dealt specifically with opioids, the sheer volume and pace of the calls hindered pharmacists' ability to vet each prescription carefully as required by law.

344.     UHG/Optum also required its prior authorization pharmacists to adhere to strict metrics concerning the number of cases per hour. ████████████████████████████ ████████████████ This number of cases is unrealistic for a pharmacist to complete accurately and put undue pressure on pharmacists.

345.     UHG/Optum   prior   authorization   pharmacists ████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████

346.     The pressure on mail order pharmacists was compounded by the constant threat of audits at UHG/Optum. ███████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████

347.     Given UHG/Optum and Express Scripts' mail order dispensing policies prioritized speed and efficiency above all else, some employees reported complete mental and physical exhaustion, continuous fear of disciplinary action, and an unrelenting pressure to fill higher volumes of prescriptions in even shorter amounts of time.

348.     The PBMs' mail order pharmacies have also been at a distinct disadvantage when it comes to performing opioid due diligence in comparison to community retail pharmacies. The mail order pharmacists evaluating opioid prescriptions do not see the patient face to face as a pharmacist in a retail pharmacy does. Some red flags, which are only apparent upon personal interaction with drug-seeking patient such as the patient showing signs of intoxication or having a

diagnosis that does not match his or her physical appearance, were simply impossible to detect in the mail order setting.

349.    Furthermore, the Express Scripts and UHG/Optum mail order pharmacists lacked familiarity with the geographic regions they served. While a typical retail pharmacy has the benefit of knowledge gained from serving the same patient and prescriber population day in and day out, the mail order pharmacies served patients nationally. This has meant that a pharmacist working at an Express Scripts or UHG/Optum mail order pharmacy may be based in California, but would be dispensing prescriptions for patients from places like Texas, Ohio, and even Puerto Rico. The national scope of the mail order pharmacist responsibility made it nearly impossible to recognize such things as pattern prescribing or doctors under local law enforcement investigation. This problem was only exacerbated by the lack of information and assistance provided to pharmacists by Express Scripts and UHG/Optum.

350.    Against this backdrop, Express Scripts has also been subject to substantial regulatory action for its failures to implement appropriate controls on prescribing and dispensing. For instance, on May 15, 2012, Express Scripts Pharmacy Services, Inc. agreed to pay the United States $2.75 million to resolve allegations under the Controlled Substance Act. Among the allegations was that from 2002 through 2006, drug diversion occurred at several Express Scripts mail order facilities, including facilities in Bensalem, PA and Harrisburg, PA. Express Scripts experienced theft by employees of controlled substances, had inventory discrepancies, and failed to report in-transit losses to the DEA. According to the DOJ press release, from 2004 through 2009, Express Scripts employees utilized invalid DEA numbers in Express Scripts' computerized prescription processing system in order to process certain controlled substances prescriptions at all of its mail order facilities.

351.    As part of the settlement, Express Scripts was required to develop a comprehensive Controlled Substances Security Compliance Plan that included diversion protection measures far beyond those required by law, including improved physical security, enhanced inventories, reconciliations and audits, employee background checks, and mandatory training for employees who have contact with controlled substances. Express Scripts executives, including the General Manager of Pharmacy Operations and the Chief Compliance Officer, were required to certify compliance with the terms of the Plan. In addition to the measures to protect against diversion of controlled substances, Express Scripts was also required to cease use of phony DEA numbers and agreed to set up an automated system to check the validity of prescribers' DEA and NPI (National Physician Identifier) numbers against a national registry.

352.    By way of further example, as a result of a whistleblower lawsuit brought by two former Las Vegas mail order pharmacists, in 2006 Medco agreed to a $155 million settlement to resolve claims with the United States related to its dispensing of drugs at its mail order pharmacies. The government's complaint alleged Medco accepted payments from drug makers to favor their drugs and submitted false claims for mail order prescription drugs provided to millions of federal employees, retirees and their families. Among the allegations was that Medco's mail order pharmacies failed to conduct concurrent drug utilization review ("cDUR") for all prescriptions in order to identify potential adverse drug interactions. The government alleged that, as a result of the pressures to meet quotas, Medco's DUR employees regularly: a) fabricated physician call records so as to maintain hourly call quota rates; b) completed physician calls without ever having pharmacists verify the information with the physician's office; c) changed prescriptions without a pharmacist's intervention; and/or d) falsified records to indicate DUR calls were made to physicians when in fact these calls had not been made.

**D.      Defendants Have Admitted They Could Have Prevented the Opioid Epidemic**

353.    Express Scripts' and UHG/Optum's own documents confirm that had Defendants acted decades ago, when they first knew that opioids were being overutilized, over dispensed, and abused throughout the country they could have stopped the opioid epidemic.

354.    For example, UHG/Optum recently reported that after implementing appropriate formulary and utilization management measures to restrict opioids—that it should have implemented years ago—there was a 82% decrease in first fill opioid prescriptions that fell above the CDC recommended dosage; a 65% decrease in first-fill opioid prescriptions exceeding the 7 day maximum supply; a 68% decrease in prescriptions for chronic opioid utilizers that exceeded 90mg Morphine Equivalent Dosing per day; and a 14% reduction in average doses among all opioid prescriptions.

355.    Likewise, Express Scripts recently reported that after implementing appropriate formulary and utilization management measures to restrict opioids—that it should have implemented years ago—Express Scripts observed a 38% reduction in hospitalizations and 40% reduction in emergency room visits, a 19% decrease in the days' supply of opioids dispensed; 93% of patients prescribed an opioid for the first time started with a 7-day supply or less; 77% of patients prescribed a long-acting opioid therapy were redirected to a safer, short-acting medication; and the average day's supply per claim for first time opioid users dropped 55% from 18.6 days to 8.3 days.

356.    Had Defendants taken these steps when they first knew the opioid epidemic was unfolding—as early as 2000— Express Scripts and UHG/Optum could have prevented the public health crisis with which this country is now dealing.

**E.    Express Scripts and UHG/Optum Caused the Public Health Crisis in Strafford County**

357.    By conspiring with the Opioid Manufacturers, by facilitating and failing to address the overprescribing and overuse of opioids, by failing to address evidence of the overuse, abuse, and addiction to opioids, and by failing to prevent diversion in its mail order dispensing and in its pharmacy networks, UHG/Optum and Express Scripts contributed to the oversupply of opioids in New Hampshire and Strafford County, and the resulting damages and public nuisance.

358.    According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that over 1,000,000 people died from an overdose involving opioids from 1999 until present. Based on the latest data, approximately 3 million Americans met criteria for prescription opioid abuse and dependence in 2022. Since 1999, the amount of prescription opioids dispensed in the United States and the number of overdose deaths involving opioids have both quadrupled. In recent years, New Hampshire ranks in the top five states with the highest rate of opioid-involved deaths.

359.    In addition to the toll on families and loved ones, opioid use imposes significant economy-wide costs. The U.S. Congress Joint Economic Committee estimates the opioid epidemic cost $1.04 trillion in 2018, $985 billion in 2019 and nearly $1.5 trillion in 2020. The rise in fatal opioid overdoses in 2021 suggests the total cost is likely to continue to increase.

360.    Strafford County has been particularly hard hit. In 2016, Strafford County had the most EMS Narcan administration incidents per capita and the most opioid related ED visits per capita in New Hampshire.

361.    In recent years, overdose deaths have risen in New Hampshire, with the total reaching more than a thousand for 2022. Opioid overdose deaths in New Hampshire now account for over 40% of all unintentional deaths and 65% among 18–34 year olds.

362.    While UHG/Optum and Express Scripts were reaping millions of dollars in profits from their wrongful conduct, Strafford County has been required to allocate substantial public monies and resources to combat the opioid crisis and cope with its fallout.

363.    Strafford County has incurred and continues to incur substantial costs because of UHG/Optum's and Express Scripts' conduct as alleged more fully herein, including, but not limited to, costs of increased services with respect to law enforcement and first responders, such as emergency medical services; Strafford County health facilities, including hospitals and clinics; detention centers and jails; courts, including drug courts; diversion programs; prevention and treatment centers; community outreach programs; equipment and supplies; victim services supports; drug abuse prevention programs in schools; inmate services including housing, health and support staff; intervention programs; and increased costs associated with its own employee benefits plan, together with general societal and lost productivity costs

## V.        TOLLING OF THE STATUTE OF LIMITATIONS

364.    Plaintiff Strafford County, as a political subdivision of the State of New Hampshire is not subject to any applicable statute of limitations.

365.    Even assuming, *arguendo*, that Strafford County was subject to applicable statutes of limitation, in the alternative Strafford County asserts the following tolling doctrines.

366.    Defendants' conduct has continued from the 1990s through today and is still ongoing. The continued tortious and unlawful conduct by Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants has not ceased. The public nuisance remains unabated.

367.    In addition, Defendants are equitably estopped from relying upon a statute of limitations defense. In New Hampshire, the statute of limitations is tolled if, as occurred here, the Defendant fraudulently concealed the existence of the claim. Only when the plaintiff discovers or could have discovered the claim through reasonable diligence does the clock start again.

368.    Here, Defendants undertook efforts to purposefully conceal their unlawful conduct by: manipulating and distorting public information, knowledge, and facts; misrepresenting their role in the pharmaceutical market as promoting safe use and appropriate opioid dispensing; failing to make public or otherwise produce nonpublic information, over which Defendants had exclusive possession, dominion, and control, that would have revealed the truth; and by deliberately and fraudulently concealing the truth.

369.    Defendants had in their possession and control information that the Opioid Manufacturer's opioids were addictive; data suggesting or proving that large amounts of opioids were being diverted from legitimate channels; and information that specific doctors and pharmacies were engaged in an illegal pattern of conduct.

370.    Defendants purposely concealed their wrongful conduct, including by assuring the public and governmental authorities that they were complying with their obligations and were acting to prevent diversion and drug abuse. The Defendants were aware of the falsity of their misrepresentations because they were aware of their own history of conduct which included repeated breaches of such duties.

371.    Defendants hid their relationships with the Opioid Manufacturers, making it impossible for Strafford County to discover Defendants' role in promoting opioids through reasonable diligence.

372.    The relationships between Defendants and the Opioid Manufacturers remain notoriously opaque even to the present day.

373.     Defendants have also concealed and prevented discovery of information that will confirm their identities and the extent of their wrongful and illegal activities.

374.     Because Defendants concealed the facts surrounding the opioid epidemic, Strafford County did not know of the existence or scope of the Defendants' misconduct and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

375.     Defendants intended that their false statements and omissions be relied upon.

376.     Defendants knew of their wrongful acts and had material information pertinent to their discovery, but concealed that information from the public, including Strafford County.

377.     Only Defendants knew of their widespread misinformation campaign and of their repeated, intentional failures to prevent opioid overutilization and diversion.

378.     Defendants cannot claim prejudice due to a late filing because this suit was filed upon discovering the facts essential to the claim. Indeed, the full existence, extent, and damage of the opioid crisis and those responsible, including Defendants and their relationships with the Opioid Manufacturers, has yet to come to light and will only be fully understood after Plaintiff has had an opportunity to obtain discovery.

## VI.     CAUSES OF ACTION

### COUNT I
### PUBLIC NUISANCE

379.     Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

380.     Defendants intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injure property, health, safety, or comfort of a considerable number of persons in Strafford County by promoting, dispensing, facilitating, and increasing the sale of opioids in Strafford County.

381.    Defendants knew that opioids were being dispensed into Strafford County and surrounding areas in dangerous amounts and were being overutilized, abused, and diverted into illicit drug markets.

382.    Defendants knowingly and intentionally designed benefit plans and standard formularies that would maximize opioid utilization.

383.    Defendants knowingly, intentionally, recklessly, and negligently failed to manage these plans to minimize the use and abuse of opioids.

384.    Defendants knowingly and intentionally chose to include opioids on their formularies that they knew were highly addictive and dangerous. Defendants did not install reasonable controls in the form of quantity limits, prior authorization requirements, cDUR edits, refill limits, step edits, or MME daily limits.

385.    Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain. To this date, dozens of non-narcotic pain treatments are not covered by PBM baseline national formularies. This led directly to the increased sale and use of opioids.

386.    Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

387.    To this date, Defendants chose not to cover or create barriers to accessing drugs typically used to treat Opioid Use Disorder ("OUD") such as naloxone, methadone, buprenorphine, and naltrexone.

388.    Defendants fail to adequately monitor their retail pharmacy networks to ensure that opioids were not being overutilized, abused, and diverted into illicit drug markets.

389.    At all relevant times, Defendants had the power to minimize the sale and use of less effective, more addictive, and more divertible opioids. They could have installed preauthorization

requirements for opioid prescriptions for chronic pain, when other non-opioid options were available. They could have responded favorably to direct requests from governmental payors attempting to control opioid flow and offer non-opioid options. They could have made it easier for patients to access less addictive, less dangerous drugs and treatment drugs. They could have monitored and modified patients' usage. They could have imposed stricter quantity limits or refill limitations or pre-authorization requirements.

390.    Defendants have also created and maintained a public nuisance by colluding with the Opioid Manufacturers to make opioids more available, by ignoring evidence of addiction and misuse found in their data, by failing to maintain effective controls against diversion, by expanding the opioid market relying on and disseminating false and misleading information regarding the efficacy of opioids for chronic pain and dangers (or lack thereof) of addiction, leading to an oversupply of opioids in Strafford County.

391.    Defendants have also created and maintained an absolute public nuisance through their role as a dispenser of opioids in New Hampshire and Strafford County. Through this role Defendants' unlawful and unreasonable nuisance-creating conduct includes violating federal and New Hampshire statutes and regulations, including the controlled substances laws, by dispensing opioids without maintaining effective controls against diversion, including but not limited to failing to utilize their own data and the data available to them to detect or guard against diversion.

392.    At all times relevant to this Complaint, Defendants knew that increasing the availability of opioids would increase the number of opioids that would be abused, misused, and diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

393.    At all times relevant to this Complaint, Defendants knew that opioids were dangerous because these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

394.    Indeed, opioids are akin to medical grade heroin. Defendants' intentional, unlawful, wrongful and unreasonable conduct of pushing as many opioids onto the market as possible led directly to the public nuisance and harm to Plaintiff—exactly as would be expected when medical grade heroin in the form of prescription opioids flood the community and are diverted into an illegal, secondary market.

395.    It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Plaintiff described herein.

396.    Because of Defendants' actions to make opioids more available in the marketplace and Defendants' special position within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

397.    Defendants' conduct was and continues to be a substantial factor causing the ongoing, persistent absolute public nuisance described and the harm to Strafford County. Given their gatekeeper position in the prescription drug marketplace, the PBMs have always been, to quote their own words, "uniquely positioned to abate the opioid crisis."

398.    Defendants knew, or should have known, that their intentional, unreasonable, and unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that their conduct has created an ongoing, persistent public nuisance that endangers the health and safety of the County and impacts negatively on the County's ability to provide essential services.

399.    The public nuisance created by Defendants' intentional and persistent course of conduct has directly and proximately caused and continues to cause significant economic harm to Strafford County that includes but is not limited to:

(a)    Responding to opioid-related drug overdoses and deaths;

(b)    Allocating resources for the disease of addiction and other diseases related to long-term opioid use;

(c)    Allocating resources for child abuse and neglect resulting from opioid abuse;

(d)    Allocating resources for crime associated with illegal drug use and opioid sales;

(e)    Addressing related blight, vagrancy, property damage, and property crime.

400.    Defendants' actions also foreseeably created a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' deceptive and improper conduct is not only an explosion of prescription opioids on the black market, but also—predictably—a marked increase in the availability of heroin and synthetic opioids.

401.    The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids caused by Defendants' misconduct has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of the County.

402.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

403.    Public resources are being unreasonably consumed in efforts to address the opioid epidemic, including expenditures for special public service programs, thereby eliminating available resources which would otherwise be used to serve the public at large in the County.

404.    Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimate societal interest in Defendants assisting the Opioid Manufacturers dissemination of false "scientific" facts and advice in their pursuit of increased profits and the expense of communities and families nationwide. There is no legitimate societal interest in the Defendants constructing formularies that ensure uncontrolled opioids, and create barriers to treatment and less addictive pain alternatives.

405.    The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to Summit County and the harm inflicted outweighs any offsetting benefit.

406.    As a direct and proximate result of the common law public nuisance, the County has sustained (and continues to sustain) harm by spending a substantial amount of money trying to fix the harms caused by the Defendants' nuisance-causing activity, including, but not limited to, the costs of hospital services, healthcare, emergency medical services, social services, prevention, treatment, education, intervention and law enforcement and overhead expenses as set forth more fully herein. These damages constitute a unique harm to Strafford County, which harm can only be suffered by Strafford and is different from the harm suffered by the citizens at large.

407.    Defendants' misconduct resulting in the public nuisance has directly and proximately caused Plaintiff to suffer stigma/reputational damage, property damage, and damage to its proprietary interests.

408.    The public nuisance – *i.e.* the opioid epidemic deliberately created, perpetuated and maintained by the Defendants can be abated and further recurrence of such harm can be abated.

409.    Defendants' misconduct alleged in this case is ongoing and persistent, as is the nuisance to which they substantially contributed.

410.    Defendants should be required to pay for the harm the County has suffered and/or will suffer because of the absolute public nuisance Defendants caused.

411.    Defendants' intentional, unlawful, and persistent course of deceptive and improper conduct, as alleged herein, has created an ongoing, conscious and deliberate nuisance that is continuing and recurring to this day.

412.    Defendants' conscious and deliberate acts have caused long-lasting and permanent harm to Plaintiff, as described herein in detail.

413.    Plaintiff seeks to abate the nuisance created by Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public**.**

414.    Plaintiff has suffered, and will continue to suffer, unique harms as described in this Complaint, which are of a different kind and degree than the New Hampshire citizens at large. These harms are unique to Strafford County.

415.    Plaintiff is asserting its own rights and interests and Plaintiff's claims are not based upon or derivative of the rights of others.

416.    The misconduct of the Defendants was a substantial factor in creating the public nuisance.

417.    The misconduct of the Defendants was a substantial factor in producing harm to Plaintiff. Plaintiff has suffered an indivisible injury as a result of the tortious conduct of the Defendants. Defendants acted with actual malice because Defendants acted with a conscious

disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

418.     Therefore, Strafford County demands judgment in its favor against Defendants for injunctive relief, abatement of the common law absolute public nuisance, and for damages in an amount to be determined by a jury, together with all costs of this action, including pre-judgment interest, post-judgment interest, costs and expenses, attorneys' fees and such other relief as this Court deems just and equitable.

**COUNT II**
**CONSPIRACY**

419.     Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

420.     In order to achieve the objectives of the wrongful conduct, which includes the torts of public nuisance, the Defendants conspired with the Opioid Manufacturers of dangerous opioids in order to profit from their mass sale and distribution.

421.     The Defendants and Opioid Manufacturers maliciously agreed to combine their efforts to deceive the public through marketing dangerous opioids as safe and misstating the drugs' addictive qualities in order to profit from their sale and distribution.

422.     Defendants furthered this agreement by, despite knowing the danger of open access to opioids, intentionally giving opioids preferred placement on its formularies, and not placing adequate controls on the prescribing and sale of these drugs. Additionally, Defendants furthered this agreement by manufacturing research to deceive Plaintiff and its citizens that opioids were safe and misstating the drugs' addictive qualities.

423. As an intended result of the intentional and malicious wrongful conduct as set forth in this Complaint, Defendants have profited and benefited from the opioid epidemic they caused, thus harming Strafford County.

### COUNT III
### AIDING AND ABETTING

424. Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

425. Each Defendant had actual knowledge of the unlawful acts of the Opioid Manufacturers but continued to knowingly provide substantial assistance or encouragement to the Opioid Manufacturers with unlawful intent and knowledge that such parties were wrongfully increasing sales of opioids beyond legitimate medical purposes.

426. Each Defendant rendered substantial assistance despite their knowledge that the Opioid Manufacturers activities were unlawful.

427. By each Defendant's actions alleged above, each Defendant aided and abetted the commission of the causes of action alleged herein.

428. As a direct and proximate result of the Opioid Manufacturers unlawful marketing and sales efforts and all the activities performed in connection therewith, to which Defendants provided substantial assistance, Plaintiff sustained damages and losses and demands to be made whole.

### COUNT IV
### ENHANCED COMPENSATORY DAMAGES

429. Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

430. Defendants acted with a prolonged indifference to the adverse consequences of their actions and/or omissions.

431.  For all the aforementioned reasons, Defendants are liable for enhanced compensatory damages as they engaged in wanton, malicious, and oppressive conduct.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Strafford County, prays that the Court enter judgement against the Defendants, jointly and severally, ordering as follows:

(1)  That the acts alleged herein be adjudged and decreed to be unlawful in violation of State and common law and that the Court enter a judgment declaring them to be so;

(2)  That Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, be enjoined from engaging in the unlawful conduct alleged herein;

(3)  That Defendants be ordered to abate the public nuisance that they created in violation of New Hampshire common law;

(4)  That the Court order equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

(5)  That Defendants disgorge unjust profits;

(6)  That Plaintiff recover all compensatory damages, punitive damages, and treble damages in an amount to be determined at trial;

(7)  That Plaintiff be awarded costs and expenses of maintaining this action, including reasonable attorneys' fees, pursuant to statute where appropriate;

(8)  That Plaintiff be awarded pre- and post-judgment interest; and

(9)  That Plaintiff be awarded such other and further relief as the Court deems just and proper.

## VIII.     JURY DEMAND

Plaintiff, Strafford County Board of Commissioners, demands a trial by jury on all claims to the maximum number of jurors permitted by law.

Date: June 9, 2023                              Respectfully submitted,

                                                */s/ J. Gerard Stranch, IV*
                                                **STRANCH, JENNINGS & GARVEY, PLLC**
                                                J. Gerard Stranch, IV
                                                Jack Garvey
                                                The Freedom Center
                                                223 Rosa L. Parks Avenue, Suite 200
                                                Nashville, TN 37203
                                                Telephone: (615) 254-8801
                                                Facsimile: (615) 225-5419
                                                gstranch@stranchlaw.com
                                                jgarvey@stranchlaw.com

                                                **BONSIGNORE TRIAL LAWYERS, PLLC**
                                                Robert Bonsignore
                                                Ross Friedman
                                                3771 Meadowcrest Drive
                                                Las Vegas, NV 89121
                                                Telephone: (781) 350-0000
                                                Facsimile: (702) 852-5726
                                                rbonsignore@classactions.us
                                                ross@classactions.us

                                                **The Cicala Law Firm PLLC**
                                                Joanne Cicala
                                                Joshua Wackerly
                                                R. Johan Conrod
                                                101 College Street
                                                Dripping Springs, TX 78620
                                                Tel: (512) 275-6550
                                                Fax: (512) 858-1801
                                                joanne@cicalapllc.com
                                                josh@cicalapllc.com
                                                johan@cicalapllc.com

                                                ***ATTORNEYS FOR PLAINTIFF***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 9, 2023, I electronically filed a version of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record at their e-mail addresses on file with the Court.

*/s/* J. Gerard Stranch, IV
J. Gerard Stranch, IV

94